· WESTINGHOUSE MACH. CO. v. PRESS PUB. CO. ·

(Circuit Court, W. D. Pennsylvania. February 11, 1904.)

No. 19.

**1. PATENTS—INFRINGEMENT.**
  Infringement of a device for regulating the quantities of air and gas respectively admitted to the mixing chamber of a gas engine is not avoided by so changing the mechanism that the quantity of air admitted remains the same while the quantity of gas is variable.

**2. SAME—DEVICE FOR REGULATING OPERATION OF GAS ENGINES.**
  The Westinghouse and Ruud patent, No. 583,585, for a device for controlling and regulating the operation of gas engines, which may be adjusted at will to admit different proportions of air and gas to the mixing chamber, and also by means of a governor automatically regulates the quantity of the mixture fed to the engine, was not anticipated and is valid as to claims 12 and 18, but claim 2 was anticipated by the Foulis English patent No. 180 of 1881. Claims 12 and 18 also *held* infringed.

**3. SAME—RIGHT TO INJUNCTION—THREATENED INFRINGEMENT.**
  Defendant bought an infringing machine, which it commenced using after suit brought, but with such alterations that it did not infringe. It denied the validity of the patent, however, and throughout the suit asserted its right to use the machine in the manner its construction contemplated, and could have put it in shape for such use in a short time and with little expense. *Held*, that complainant was entitled to an injunction notwithstanding the fact that there had been no actual infringement.

. In Equity. Suit for infringement of letters patent No. 583,585, for means for controlling and regulating gas engines, granted to George Westinghouse, Jr., and Edwin Ruud, June 1, 1897. On final hearing.

J. Snowden Bell and Bakewell & Byrnes, for complainant.

Way, Walker & Morris and Whitaker & Prevost, for respondent.

BUFFINGTON, District Judge. This is a bill in equity brought by the Westinghouse Machine Company against the Press Publishing Company charging infringement of claims 2, 12, and 18 of patent No. 583,585, granted June 1, 1897, for "means for controlling and regulating operation of gas engines," to George Westinghouse, Jr., and Edwin Ruud, and by them assigned to the complainant. The defenses are noninfringement and invalidity of the patent.

There are two important factors in gas engine practice. One is a question of quality or the mixture of proper proportions of air and gas; the other, of the quantity of such mixture fed to the engine. Proper relative proportions of gas and air are the essentials to obtaining quality, and on quality depends proper explosive results and economy of operation. The other is the feeding of such a proper quantity of such quality and no more as shall meet power operative requirements. The conditions affecting these essentials of quality and quantity are variable, and therefore necessitate the use of adjustable controlling factors. Thus, as affecting quality, different gases vary in kind, as natural, artificial, or producer gases. Natural gases differ from each other, and, while received from a single source of supply, will vary from time to time. Temperature, pressure, and other factors also affect quality. These factors all require a different proportionate adjustment

of gas with air in order to obtain the quality of mixture essential to maximum efficiency. The demands for such proportionate changes are so instant that they should be made while the engine is running, and the variations of power requirement is so rapid that an automatic means for increasing or decreasing the fuel supply is required. Such a unitary adjustable mechanism is shown in the patent in suit. Briefly stated, the mechanism is such that it controls the respective quantity of gas and air admitted through separate ports by horizontally rotating independently of each other two sections of a valve, and thereby narrowing the width of such air and gas port openings. This rotating action affects the relative proportions of air and gas, since each valve section is independent of the other, and so permits individual sectional rotary movement. Both these valve sections are adjusted to a vertical conjoint synchronous movement, which vertically narrows both the air and gas openings at the same time, and so increases or decreases the quantity fed to the engine without affecting the quality of the mixture. This vertical movement of the valve is effected by a governor of the ordinary type, so adjusted that as the speed of the engine increases the quantity fed is diminished, and vice versa. The device is well described by one of respondent's witnesses, who says:

"The controlling and regulating device of the patent in suit affords means whereby the separate and independent supply of the constituents of the mixture—that is, the air and gas—may be so controlled and regulated that any desired proportion of these constituents may be established to form a desired character of explosive mixture, and thereafter the quantity of the constituents may be controlled or regulated according to the load upon the engine, without varying the established proportions of the constituents. The first of these controlling adjustments is regulated by hand; the second, by a governor performing in this connection the usual office of a governor."

The engine of the defendant was built by a manufacturing company. Without entering into details of construction, it suffices to say that the quality of the mixture is controlled by horizontally hand-rotated valve openings which serve to admit air and gas in proportionate quantities. The mechanism differs from complainant's in that the air inlets are not changed, and through them a fixed quantity of air is always admitted. Proportionate results are obtained by changing the gas inlets alone. Governing the quantity of mixture while leaving the proportions unchanged is secured by a vertically moving valve actuated by a governor, which throttles or unthrottles, to secure speed uniformity, under varying speed conditions, in the same way as complainant's device. This is tersely stated in respondent's brief, which says:

"From an examination of this drawing, it will be seen that the air enters the upper part of the valve-casing, and passes through the annular openings or grooves in the upper part of the valve, and thence upward into the mixing chamber above the valve. The gas enters the lower part of the valve casing separately from the air, and, passing through the registering gas ports of the casing and valve, enters the central tube of the valve, and passes up through the same into the mixing chamber above the valve, where it mixes with the air. It will also be seen that by turning the valve around within its casing the gas ports in the lower part of the valve and casing can be brought more or less into registration, and vary the size of the resulting gas inlet openings, while the said rotary movement of the valve has no effect whatever upon the air inlets, since the air apertures in the valve extend entirely around the valve in the form of annular slots. It is also apparent that the vertical movement

of the valve within the casing, under the influence of the governor, will throttle both the gas and the air separately."

The mere fact that respondent's device makes the air a fixed unit, and adjusts proportions through the gas opening, does not differentiate it from the complainant's, where, if necessary, both air and gas openings may be adjusted to secure proper proportions. A patented device that obtained relative motion between two parts by motion of both is not evaded by fixing one part and moving the other only. Tondeur v. Stewart (C. C.) 28 Fed. 561. To us it is apparent that, in substance and in operation, the two devices are the same; their different parts cooperate in substantially the same way as do complainant's, and unite to produce the same result.

Was this device anticipated in the prior art? As the nearest alleged approach is the English patent to Foulis, No. 180 of 1881, we confine ourselves to a discussion of its effect. That patent shows a valve adapted (if combined with proper controlling mechanism) to provide the quality and regulate the quantity of air-gas mixture supplied to a gas engine. Thus one of complainant's experts says it shows "a valve for controlling the air and gas supply, which is adapted to be adjusted in one direction to vary the proportions of the air and gas and in another direction to vary the quantity only of the air and gas." The other describes it as containing "air and gas passages, and a valve mechanism adapted to be adjusted in one direction to vary the proportions of air and gas, and movable in another direction to vary the quantity of the air and gases passing through it." But while a valve substantially such as complainant uses in combination is shown by Foulis, in that it is capable of hand rotary movement to affect quality and vertical movement to affect quantity, yet when it comes to the control of the vertical movement, which in the complainant's device is through a co-acting automatic governor, which curtails or increases the fuel supply in answer to the varying demands of the engine, and so secures uniformity of speed under varying loads, we find such controlling appliance is not disclosed in the Foulis device or any such combination shown. It is true in this patent Foulis sought both to provide quality and regulate quantity, and he so expressed himself as we shall see; but it seems to us from a study of his patent he sought to do so by two different appliances, and not by a unitary co-acting structure such as complainant uses. As to his method of obtaining quality, viz., a proper proportionate mixture, he says in his provisional specification:

"The object is so to construct the valve attached to the air and gas mixing apparatus described in the aforesaid specification, No. 2,422, A. D. 1880, so that the air and gas orifices always maintain a constant ratio of and to each other. This is effected by making the valve casing or cylinder with a piston therein, which piston, as it rises or falls, opens or closes the air and gas ports in this way in a given proportion."

In his specification he states:

"In order that the air and gas orifices of the valve attached to the air and gas mixing apparatus, described in the aforesaid specification of my patent, No. 2,422, A. D. 1880, shall always maintain a constant ratio of and to each other, the valve casing or cylinder is provided with a piston, which piston, as it rises or falls, opens or closes the air and gas ports in this way in a given

proportion, it being explained that this valve is not necessarily attached to the aforesaid mixing apparatus."

And he embodies this in his eleventh claim:

"A valve for admitting the required regulated quantities of air and gas to the pump and to the igniter heating jet of gas engines, and for adjusting the proportions thereof so that when adjusted their passage may be regulated (either by hand or by the bag of the air and gas mixing apparatus) to admit the air and gas in the constant proportion, the one to the other, for which the valve has been set, essentially as hereinbefore described with reference to figures 8 to 13 of the accompanying drawings."

Turning now to the patent of 1880, in which this attached apparatus is described, we find that patent was one, not for regulating and feeding to a gas engine controlled quantities of an already secured proportional mixture, but, in so far as the gas supply was concerned, was wholly and only for obtaining a proper proportional mixture. Thus he says: "Figure 3 represents in sectional elevation, and figure 4 in sectional plane, the arrangement for mixing the air and gas in proper proportions necessary for their complete combustion." From this chamber the mixture was drawn into a flexible chamber, and from thence it was taken by the engine as required. Says the patentee: "By this arrangement a reservoir of properly mixed air and gas is at all times maintained, from which the engine, when in operation, draws off the quantity required." He prevents the gas in the flexible chamber from interfering with obtaining a proper proportional mixture in the superimposed chamber by the lip $1^4$, which "prevents the air and gas from gaining admission to the flexible chamber until the valve has risen to an extent sufficient to prevent the pressure of the gas from being unduly exerted so as to interfere with the just proportions of air and gas decided by the regulated admissions of the inlets, m and n." This language is obscure, but from it we gather, what seems indeed to be the obvious sequence, that the faster the engine ran the greater would be the exhaust pull; the greater such pull the higher and sooner the stem would arise—thus admitting more air and gas to the superimposed chamber, and also sooner opening the lip to admit more of the mixture to the flexible chamber. In other words, this mixing device, without some other regulating factor, would supply more fuel the faster the engine ran—an operation wholly at variance with the object of complainant's device. Mr. Foulis says:

"The weights, 1, keep the valve, $1^3$, closed at all times when the air and gas are not flowing into the chamber, k (thus automatically shutting off the flow of gas when the engine is stopped); but when the exhausting effect due to the motion of the pistons reduces the pressure therein, then the weight is lifted so that the valve, $1^3$, is raised from its seat, and the air and gas are admitted to the said chamber."

But not only was this device, as shown in the patent of 1880, not constructed or intended to regulate the quantity of mixture fed to an engine, but when Foulis, in his patent of 1881, sought to regulate the quantity of mixture fed to an engine, he used this device of 1880 simply as a proportional mixer, making it as such the subject of claim; but he showed other means and made other claims for a device to regulate

quantity. This will be seen from an examination of the patent. Thus, in stating the objects in his provisional specification, he says:

"Eleventhly, to regulate the speed and power of gas engines. The object is or may be effected by placing a throttle valve on the suction pipe, or by placing a chamber attached to the delivery end of the pump, and coupled to the said pump by means of a pipe provided with a stopcock. When it is required to deliver less gas and air into the cylinder or cylinders of the engine than that which is due to the whole stroke of the pump piston, this valve on the pipe between the pump and the aforesaid chamber or chambers is opened to any desired extent, so that a portion of the mixture of air and gas is forced thereinto at each compressing stroke, and drawn out therefrom at each outward stroke. Or this object may be effected by causing the pipe to make each alternate stroke without pumping the gaseous mixture into the cylinder, by means of a valve driven by an eccentric."

This purpose he substantially restates in his specifications:

"To regulate the speed and power of the engine, a throttle valve is or may be placed on the suction pipe, or a chamber or chambers may be employed attached to the delivery end of the pump, and coupled to the said pump by means of a pipe provided with a stopcock or valve. When it is required to deliver less gas and air into the cylinder or cylinders of the engine than that which is due to the whole stroke of the pump piston, this cock or valve on the pipe between the pump and the aforesaid chamber or chambers is opened to the required extent, so that a portion of the mixture of air and gas is forced thereinto at each compressing stroke, and drawn out therefrom at each outward stroke."

The means he employs for so regulating he sets forth:

"The controlling of the quantity of gaseous mixture admitted to the power cylinder may be carried into effect by the arrangement illustrated in Fig. 16. A valve, q, is arranged in the chamber, Q (which receives the gaseous mixture from the pump), to open more or less or close a communication between this chamber and the receiving chamber or chambers. This valve is opened by the tappet, r, accentuated by the eccentric, which operates the exhaust valve by the rod, $r^2$, attached at one end to a collar, $r^3$, on the eccentric rod, $i^4$, the other end being attached to a pin, $r^4$, engaging in a slot in the lever, $r^5$, keyed to the axis, $r^6$, which carries the said tappet, r. A rod, $r^7$, acted upon by an ordinary governor is also connected to the pin, $r^4$, so that as the said rod, $r^7$, rises or falls under the action of governor, the pin, $r^4$, will be raised or lowered in the slot in the lever, $r^5$, and a greater or less degree of opening be given to the valve, q, to cause a greater or less amount of the explosive mixture to pass into the power cylinder at each stroke according to the speed of the engine; the surplus mixture at each stroke passing into the receiving chamber or chambers not shown, but which will be connected to the flange at s. From this chamber or these chambers this surplus mixture is drawn back into the pump at its next forward stroke."

And this he embodies in claim nine:

"The arrangement for governing the quantity of explosive mixture admitted to the engine, essentially as and for the purpose hereinbefore described and illustrated in Fig. 16 of the accompanying drawings."

We have not overlooked the contention of respondent's counsel that the structure shown in Fig. 16 is wholly different from that shown in Figs. 8 and 9. This is true; but that very fact is fatal to the claim of anticipation, for the devices of Figs. 8 and 9 are specified and claimed as quality, not quantity, regulating devices, while Fig. 16 is stated and claimed as the quantity regulating device of the patent. To us it is clear not only that the use of the rotary vertical valve by Foulis was not for the purpose of regulating quantity of mixture, but that such use,

if applicable and applied to complainant's device, would defeat the speed uniformity sought by such device.   There is no proof that Foulis' mechanism was ever put to practical or commercial use, or that it left any impress whatever on the art.   Although it disclosed a valve adapted to rotary and vertical movement, no one during the many intervening years, until the complainant, discovered that such a valve could be automatically controlled by a governor, and thereby uniform speed automatically secured.   Finding, as we do, nothing in the prior art to anticipate its device, we are of opinion the twelfth and eighteenth claims of complainant's patent are valid and infringed.   We are, however, of opinion the second claim is invalid.   Read literally, it is conceded that, in view of the disclosure of the Foulis patent, such must be the case.   To save the claim, it is argued the element of a governor must be read into it.   We, however, see no occasion so to do.   The Foulis patent was not cited in the Patent Office, and it seems to us that the patentees sought by their claim to cover their valve alone without the limitation of a governor.   This, under the prior art, they were not entitled to do, and we are not warranted in restricting the broad claim they attempted to get by now placing upon it restrictions they did not make or intend to make.

It remains to decide whether an injunction should issue in this case. The respondent is a user, and not a maker or vendor, of this engine. After the suit was brought, and before the machine was used, a mixer of common construction was placed on the engine, the gas inlet to the engine plugged, and the mixture admitted through the air inlet.   The part of the valve communicating with the gas inlet is not used at all. It is conceded that when so equipped and used there is no infringement.   Having made no other use of the engine, the respondent contends no injunction should issue, but the bill should be dismissed. We cannot accede to this view.   This machine as constructed and intended to be used, was an infringement of complainant's patent.   The respondent has never put of record in this case its purpose not to infringe, or suggested it was a mere innocent user of a noninfringing device.   On the contrary, it has by its answer, denying the validity of the patent, by the testimony in support of that contention, and its argument at final hearing, asserted its untrammelled right to use this machine in the manner its construction contemplated.   It has retained the infringing construction in its possession, and in such condition that in two hours time a pipe-fitter could put it in infringing shape. , Parties are to be judged by their acts.   Actual user is not necessary to warrant an injunction.   In a proper case a threatened use is enough.   In Potter v. Crowell, 3 Fish. Pat. Cas. 112, Fed. Cas. No. 11,323, it was said:

"Perhaps as safe a criterion of what is to be apprehended from defendants as can be obtained is to look at that which they have done, and in their answer justify the right to do, rather than to look to the fact of their having discontinued the alleged injury."

In Robinson on Patents it is said:

"An innocent infringement, abandoned upon notice of the patent, is of comparatively little weight as evidence of this intention, though not wholly disregarded by the courts.   Assertions of his right to practice the invention, the possession of infringing machines capable of operation or of marketable arti·

cles. covered by the patent, or other indications of ability and readiness to enter into unlawful competition with the plaintiff, are also competent evidence of such intention."

See, also, Sherman v. Nutt (C. C.) 35 Fed. 149.

The parties to this litigation having contested it on its merits, the successful party should not be deprived of its substantial fruits.

Let a decree be drawn decreeing the validity of the twelfth and eighteenth claims of this patent, the invalidity of the second claim, and an injunction so framed as not to interfere with the further use by the respondent of the engine now in use with an external gas mixer and its gas inlet plugged. Such decree is to carry costs.