## JOHNSON et al. v. FOOS MFG. CO.

(Circuit Court of Appeals, Sixth Circuit. November 29, 1905. On Rehearing, January 31, 1906.)

### No. 1,418.

1. PATENTS—SUIT FOR INFRINGEMENT—EQUITY JURISDICTION.

The fact that a defendant, sued for infringement of a patent by making and selling the patented machine, has made and sold but one such machine, and that pending the suit the purchaser was licensed by complainant, does not deprive a court of equity of jurisdiction to award an injunction, unless it further appears clearly that there is no reason to apprehend the making by defendant of other infringing machines.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, § 492.]

2. SAME—INFRINGEMENT—SALE OF PARTS OF COMBINATION.

Where all the parts of a patented combination were old, and the only invention is in their new arrangement, one who makes and sells the old parts is not chargeable with infringement, provided it was done with no purpose to contribute to plans of another intending an infringement by combining such parts in accordance with the patent.

3. SAME—SUIT FOR INFRINGEMENT—DISCLAIMER OF INTENTION TO INFRINGE IN FUTURE.

> The assertion in the answer of a defendant, sued for infringement of a right to make the devices complained of as an infringement, in the absence of a very express denial of a purpose to exercise the right claimed, justifies the presumption that further infringement is to be apprehended, if that device shall prove to be an infringement, and the coupling with such assertion of a general averment that defendant does not intend to employ the patented device or to interfere with the rights 'of complainant cannot be construed as a disclaimer of an intention to continue to make the infringing device.

4. SAME—VALIDITY AND INFRINGEMENT—PROCESS AND MACHINE FOR DELINTING COTTON SEED AND HULLS.

> The Johnson patent, No. 506,268, for a process and apparatus for separating cotton seed and hulls from the fiber adhering thereto after ginning, was not anticipated, and discloses invention as to the process claim; but the mechanical claim, as well as patent No. 654,550, to the same patentee for improvements thereon, is void for lack of patentable invention, being for an aggregation of old parts, each of which performs its old function. The process claim of patent No. 506,268 also held infringed by defendant, which built and sold apparatus adapted and intended to be employed to practice such process, and thereby contributed to infringement by the user.

On Rehearing.

5. SAME—COSTS.

> Rev. St. §§ 973, 4922 [U. S. Comp. St. 1901, pp. 703, 3396], which provide that a plaintiff or complainant recovering judgment or decree for infringement of part of a patent shall not recover costs, where the claims of the patent were too broad and no disclaimer was entered before suit, do not apply to the costs in an appellate court, where the decree below dismissing the suit is found erroneous, and the complainant was compelled to appeal to obtain the relief to which he was entitled.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

W. R. Wood and R. H. Parkinson, for appellant.
H. A. Toulmin and W. A. Scott, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. This is a bill to restrain infringement of two patents granted to W. C. Johnson. The first is for certain "improvements in processes of an apparatus for treating cotton seed and hulls," and the second for "improvements in means for separating the fiber from cotton-seed hulls." The first patent was issued December 11, 1894, and bears the serial No. 506,268, the second is No. 654,550, and was issued October 25, 1898. The cause came on to be heard in the court below upon the pleadings, exhibits, and a voluminous book of evidence, but the trial judge, without passing upon the merits of the ease, dismissed the bill because he thought that the single machine made, sold, and installed by the defendant company had been subsequently licensed by complainant, upon the user agreeing to pay a royalty, and that no further infringement was threatened. The remedy at law he therefore held to be adequate to recover damages for the single infringement averred to have occurred before the bill was filed and no case made requiring an injunction against further infringement. This

result the learned trial court rested upon the authority of Woodmanse & Hewitt Mfg. Co. v. Williams, 68 Fed. 489, 492, 15 C. C. A. 520, 524, where this court said:

"The ground upon which a court of equity will take cognizance of a suit for an infringement of a patent is the relief through an injunction. There is nothing so peculiar to a suit for damages and profits for infringement of a patent as will, independently of some recognized ground of equitable jurisdiction, justify a court of chancery in assuming jurisdiction. It must appear that the legal remedy at law is inadequate, and if the case is one in which equitable relief by injunction is inappropriate, as where the patent has expired, or where the circumstances are such as to justify a court in refusing equitable relief, the suit will not be entertained for the mere purpose of an account of past damages and profits. Root v. Railway Co., 105 U. S. 189, 26 L. Ed. 975; McLaughlin v. Railway Co. (C. C.) 21 Fed. 574; Clark v. Wooster, 119 U. S. 325, 7 Sup. Ct. 217, 30 L. Ed. 392."

The principle there stated is perfectly sound, but, as we think, not applicable to the facts of this case. It is true enough that no injunction can go against the further use of the machine alleged to infringe which was made and set up at Memphis, Tenn., for the Southern Cotton Oil Company in October, 1899, because the buyer of that machine, upon notice from complainants, obtained a license and agreed to pay royalty. But independently of the fact that a patentee may not enjoin his own licensee, an injunction against one charged to have made and sold an infringing device would not operate to enjoin a buyer or user of an infringing device without joining him in the suit or otherwise seeking relief directly against him as an infringer.

We can also agree with the Circuit Court that a single infringement by making and selling a single infringing machine would not justify the interposition of a court of equity for the purpose of restraining further infringement by the making and sale of other infringing machines, if it appeared clearly that there was no reason to apprehend any further infringement. But that is not this case. The principal parts of the machinery constituting the machine of the complainant's patent had been made by the Foos Manufacturing Company, the defendant in this case. Both Mr. Robert H. Foos and Mr. Winchell of that company had visited the complainant's plant at Memphis, and had been consulted about certain matters connected with the operation of the machinery. It may as well be said here as later that all of the parts composing the apparatus covered by the claims of the two Johnson patents were old. The novelty, if any, consists in the combination and new and useful results thereby accomplished. The arrangement of the different parts was therefore of the essence of the invention, and the Foos Company had a legal right to continue to make and sell attrition mills and other parts of the mechanism which were old, provided only that they did so with no purpose to contribute to the plans of one intending an infringement by combining the parts. Heaton Peninsular Button Co. v. Eureka Mfg. Co., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728; Thomson-Houston Electric Co. v. Ohio Brass Co., 80 Fed. 712, 26 C. C. A. 107; German Am. Filter Co. v. Loew Filter Co. (C. C.) 103 Fed. 303; Loew Filter Co. v. German Am. Filter Co., 107 Fed. 949, 47 C. C. A. 94.

The claims of the first Johnson patent cover both a process and an

apparatus. The Foos Company is charged, not simply with having made and sold attrition mills and separators to the Southern Cotton Oil Company, but that they made and combined these and other parts according to a plan which was intended to employ the process of the patent and which infringed the mechanical claims of the Johnson patents as well. For the purpose of this branch of the case we shall assume that the apparatus thus installed, combined, and put in operation was an infringement of the patents owned by complainants. That Mr. Foos and Mr. Winchell of the Foos Company were familiar with the arrangement and mode of operation in the mill of the complainants is satisfactorily established. Thus under date of March 25, 1895, the defendant wrote as follows:

"Tennessee Fiber Company, Memphis, Tenn.—Dear Sirs: We note yours of the 22nd and are pleased to note your faith in both Mr. Winchell and the mills. We are quite sure, now that he has seen you and the machines in operation, that everything will be all right as soon as we get the pulleys. We will crowd the work to the utmost, and hope to make shipment in a very short time. As they are ordered, it will require some special work, which necessarily makes more delay than the ordinary run of stock.
  "Yours truly, Foos Manufacturing Co., H. S. B."

Subsequently complainants heard something of a purpose by defendants to put up similar machinery for others, and therefore wrote about it. To this the defendant replied under date July 8, 1895:

"Tennessee Fiber Company, Memphis, Tenn.—Gentlemen: We note yours of the 6th, and cannot make any definite answer, as our Mr. Winchell is in Texas at present; but we will communicate with him and advise you just as soon as we can get word. We can assure you, however, that there is some misunderstanding, as Mr. W. we know appreciates the value of your combination, and would do nothing that would interfere in any way with your plans, knowing as he does that our interests are just the other way. You appreciate this of course. We hope to be able to write you more definitely upon the subject in a few days.
  "Yours truly, Foos Manufacturing Company, H. S. B."

The admission of appreciation of the value of the "complainant's combination" and promise not to interfere with their plans is significant. In June, 1899, complainants wrote to defendant company, in which, among other things, they said:

"We understand that Memphis parties are figuring with you for machines similar to ours, for the purpose of making fiber and bran from cotton seed hulls. We are perfectly willing to give these parties the use of our patents and the benefit of our experience on payment of a fair royalty for the same. We will very promptly prosecute any infringements of our patent rights. We do not wish to make you any trouble, and would warn you against making or selling any machines to be used in our process. We have kept your Mr. Foos posted as to the developments of this business and he has had our assurance that we would push same as fast as we saw that it could be done profitably, and that we would use your mills. We are now in a position where we will either double the capacity of our plant or build for some one else a similar plant, and we will soon be in a position to figure with you, provided, of course, you respect our patents and the confidence we have always reposed in you as to the development of this business.
  "Yours very truly, [Signature not copied.]"

To this the defendants replied as follows:

"Mr. W. C. Johnson, General Manager Tennessee Fiber Company, Memphis, Tenn.—Dear Sir: We have yours of the 6th inst. with order for two sets of plates with bolts, and same shall have our prompt and careful attention. We note what you say in regard to parties at Memphis who are figuring on mills for grinding cotton-seed hulls, and in reply would state that such is the fact. Our business, you understand, is the manufacture and sale of machinery, and it would be impossible for us to dictate for what purpose or how such machinery was to be used. You certainly cannot expect us to decline to sell our machinery to anyone who might give us an order for same. We are rather surprised at your statement that you have kept the writer posted as to the development of your business, and think you must have some one else in mind. The fact is that, while he has called at your office quite a number of times during the last five years, he has never been inside of your plant, except once, and that was soon after you started and remembers very little, of anything, about your system which you stated to him the last time he saw you was now entirely different from what it was then. Further than this, we know nothing as to your method or system of doing this work nor have you ever imparted to us any information on the subject. If there is going to be any business in this line, we of course would like to have it, and would be pleased to figure with you when you are ready to place your order for more mills; but at the same time you can hardly expect us to decline to furnish mills to other parties if they should favor us with their orders. You can rest assured, however, that we will not knowingly disregard your patents so far as they cover your system and method for doing this work, or betraying any confidence you may impose in us. The writer will possibly be in Memphis some time this summer, and will be pleased to talk with you further on this subject.

"Very truly yours, The Foos Manufacturing Company,
"Robert H. Foos, Vice President."

During the summer and fall of 1899 the defendants did set up for the Southern Cotton Oil Company machinery which we for the present must assume infringed the Johnson patent. Touching this plant Mr. Johnson testifies to an interview with Mr. Foos, vice president:

"Q. Did you, after the correspondence with the Foos Manufacturing Company, referred to in your testimony, have any personal discussion with its representative regarding the controversy? and, if so, please state with whom and what the attitude taken was. (Objected to as immaterial.) A. Yes, sir. Mr. Robt. H. Foos, representing the Foos Manufacturing Company, was in the office of the Tennessee Fiber Company after they had sold machinery and started operation of the Southern Cotton Oil Company's cotton-seed hull plant. I said to Mr. Foos that he had infringed our patents, and that he had committed a breach of good faith with us in putting these people into the business, and I took occasion to formally notify him that we would sue him for the infringement of our patents. He replied that the patents were not worth the paper they were written on, and he expected to put in similar plants throughout the South, that he had waited long enough on us to develop the business, and that he expected to push it himself wherever anyone would purchase machinery from him. Q. Did Mr. Foos upon that occasion either admit or deny that the said plant installed at the Southern Cotton Oil Company's place of business here was designed and constructed and erected by the Foos Manufacturing Company? A. Yes, sir; he admitted that he had done this, said that he had no objection, if the Southern Cotton Oil Company would permit it, to our seeing his machines in operation. He openly defied us in our patents, saying that, if we could make the same hold, we undoubtedly had a good thing, but he was not going to wait on us any longer."

This denial of the validity of complainant's patents and threat to place similar plants to that complained of through the South is not denied

by Mr. Foos in any evidence to which our attention·has been called. The plant for the Southern Cotton Oil Company was finally installed October, 1899. Instead of suing that company as a purchaser and user, the complainants settled with it by giving them a license upon a contract for a royalty. In February they filed this bill against the Foos Company.

The answer was filed June following. The solicitors for the appellees have insisted that this answer is a disclaimer of any intent to further infringe. After denying the validity of the complainant's patents, that Johnson was the original inventor, that the invention was patentable, or, if valid, that complainants owned the patents, it most vigorously denies all infringement. The only paragraph which bears in any way upon respondent's· future intentions follows this interposition of every possible defense in a patent case, and reads as follows:

"Respondent denies that it has made, used, sold, or employed machines for treating cotton-seed hulls such as contained and referred to in said letters patent sued on, or in either of them; and denies that it has infringed either or both of the said letters patent by making, or using, or selling any machine whatsoever, or by employing or authorizing the use or employment of any process whatsoever contained in, or covered by, either or both of said letters patent; and denies the infringement wherewith it is charged in and by said bill of complaint; and denies that it has caused, or is·threatening to cause, the complainants any loss, damage or injury, irreparable or otherwise, and denies that the alleged letters patent embody alleged inventions capable of conjoint use; and denies that it has conjointly or severally made, used, or sold or employed the machines or process attempted to be covered in and by the patents sued on, or either of them; and denies that it has prepared, is preparing, or intends in anywise, to employ either or both of said alleged inventions, or in anywise to interfere with any of the alleged rights of complainants."

This is followed by a paragraph in these words:

"Respondent, further denying the charge of infringement, avers the fact to be that respondent has erected but one machine or apparatus, and that for practicing the old and well-known art of treating cotton-seed hulls to make a paper stock from the lint and an animal feed of the hulls, and that this one machine, which respondent furnished to third parties, has since been in part dismantled and re-organized by said third parties of their own volition and will, without the concurrence, assent, co-operation, and wishes of the complainants acting in concert with and at the suggestion, or with the permission, of said third parties; and, further, that said one machine of respondents, aside from novel details, was built and operated upon the disclosures and teachings of the prior art, as the same existed and was taught by the practices, publications, illustrations, and printed writings of others at various dates long prior to the alleged inventions embodied in either or both of the patents sued on."

The averment that it is not employing or intending "to employ either or both of said alleged inventions," or in anywise "to interfere with any of the alleged rights of complainants," cannot be construed as a disclaimer of the purpose or intent to duplicate the machines theretofore made and set up for the Southern Cotton Oil Company. If, as the answer avers, these machines do not infringe, and were built according to the practice and teaching of the old art, why should they desist? If respondents had intended to disclaim any purpose to make or sell any more of the devices ·averred to be infringing devices whether infringements· or not, and thus escape the jurisdiction of a court of

equity, their answer should have frankly so stated. Reading the answer as a whole the disclaimer of any purpose to infringe must be understood as not estopping them from supplying just such devices as they had before made; that plant, from their point of view, not being an infringement.

It is immaterial that pending the litigation there has been no further infringement. Whether there has been or not is only a matter for consideration if an accounting for damages shall be ordered. They have never put upon the record their purpose not to duplicate the device which they did make, nor contradicted the evidence that they intended to continue to make and sell such devices. The assertion of a right to make the devices complained of as an infringement, in the absence of a very express denial of a purpose to exercise the right claimed, justifies the presumption that further infringement is to be apprehended if that device shall prove to be an infringement. Cayuta Wheel Co. v. Kennedy Valve Co. (C. C.) 127 Fed. 355; Westinghouse Machine Co. v. Press Pub. Co. (C. C.) 127 Fed. 822, 827; Potter v. Crowell, Fed. Cas. No. 11,323. The case is distinguishable from that of the Globe-Wernicke Co. v. Brown & Besley, 121 Fed. 91, 57 C. C. A. 434, in the fact that an intention to continue to make and sell the devices complained of was avowed before suit was brought, and is not disavowed upon the record.

This brings us to a consideration of the validity of the first patent to W. C. Johnson issued December 11, 1894. Two claims, the first and second, are involved. The first is for a process for treating cotton-seed hulls, and the second is for an apparatus in which the process may be employed. After the process of ginning for the elimination of the cotton has been concluded there remains the cotton seed. The pulp or inner substance of the seed contains a valuable vegetable oil, which is extracted by the separation of the pulp from its hull and the extraction of the oil by heat and compression. After the oil has been extracted there remains a product which, ground into a meal, constitutes a rich food for cattle. After saving the cotton by ginning, and the oil and meal inclosed within a woody capsule, there remains the cotton-seed hulls.

This patent deals with the problem of separating the woody hull from a fine cotton fiber which surrounds and is attached to the hull. The presence or absence of kernels in the hulls does not affect the problem. Hence the inventor sometimes speaks of the material with which his invention has to deal as cotton seed and hulls. In fact, the hulls as supplied by the oil mills contain some seed, and his problem involved the handling of both the seed and the empty hulls. The hulls or capsules themselves, if ground into a bran and freed from the short, fine fiber adhering after ginning, constitute a very useful cattle food, and, when mixed with cotton-seed meal, a still more nutritious and valuable cattle food. This adhering cotton fiber, when separated from the capsule, is a valuable stock in the manufacture of paper, as a substitute for rags. The Johnson patent deals with the problem of the separation of the hull from its fiber, so as to leave a bran substantially free from fiber, and a fiber substantially free from bran, without injury to either.

That the process of the patent and the apparatus devised for the employment of the process accomplishes this result better and cheaper than any method or apparatus before known or used is abundantly established by the evidence. The evidence shows that the plant constructed and operated by the Tennessee Cotton Fiber Company of Memphis, Tenn., is successfully handling 24 tons of hulls per day, and is deriving, approximately, from this daily consumption 8 tons of fiber and 16 tons of bran. That Johnson was not the first to realize the value of these by-products of the cotton seed must be conceded. That he was not the first to make a bran partially free from fiber, and a fiber comparatively free from bran, must be also conceded. That he was the first to discover a process and devise an apparatus by which these cheap products could be produced in the best condition of each and at such low cost as to be commercially valuable is clearly shown by the evidence in the transcript. There remains therefore only the question as to whether his process and apparatus or either are novel and patentable.

First as to the process. Prior to Johnson's there were several methods for eliminating the lint from cotton hulls. One of the best known and most used was that of destroying the hulls by chemical agents which did not injure the cotton fiber. This involved a sacrifice of more than half the value of the raw material, and made the cost of the method altogether too great for commercial purposes. There can, of course, be no anticipation of Johnson's method, which was purely mechanical, by one which involved chemical agencies alone. Another method somewhat well known was that best shown by the patents to Emil Bohn of Galveston, Tex., being patents No. 437,084, issued September 23, 1890, and No. 438,984, issued October 21, 1890; the first being for a method, and the second for apparatus. Bohn's plan was to comminute the hull, including the fiber, force this commingled mass of hull and fiber through a screen for the purpose of separating the coarser parts of the hull with their still adhering fiber, and a recovery of such fiber as passed through the screen or separator by an air blast. The comminution of the hulls and fiber was accomplished by a grinding cylinder armed with a series of "sharp knife-like ribs," operating against a "series of knives" in the incasing cylinder. Bohn, in his process specification, says:

"In carrying out the invention the cotton-seed hulls and adherent fiber are introduced into a mill, A, and ground until the hulls and fiber are practically separated and reduced to comparatively small particles."

This mass of comminuted hulls and fiber is then carried in a confined chute to a screen, through which the finer particles are forced and then acted upon by an air blast; the theory being that the fine particles of fiber will be carried further by the air suction, the particles of hull as the heavier particles dropping by gravity into the first receptacle, while the lighter will be floated on to the second. The coarser particles which were not forced through the screen constitute what Bohn called "a marketable article of second grade." The material deposited by gravity in his first receptacle consists, says the patent, "principally of hulls and constitutes an article of food for stock." That which reached his second receptacle he says "consists of very fine particles of hulls and fiber and constitute the first-grade article." Bohn's

method and apparatus were employed by W. C. Johnson before he made his own discovery under the personal direction of Bohn. It was not a successful or commercially valuable experiment. The particles not passing through his screen, because of their coarseness, contained an excess of fiber, which, as fiber, was wasted and was injurious to the bran as a cattle food. His second-grade stuff was of little value as paper stock because it contained too much bran, and because the fiber was so comminuted by the grinding process as to be of less value as a paper stock than if saved as a larger fiber. From a ton of seed his average product was about 200 pounds of his "first-grade" fiber, and this, on account of the shortness of the fiber, was of diminished value.

The method of the patents to Burnett, Sears & Burnham of 1888 and 1890, being patents Nos. 380,087 and 440,259, is somewhat analogous to that of Bohn and encountered the same difficulties. Cotton seed or cotton-seed hulls were fed into a perforated cylinder in which a shaft revolved at high speed, armed with wings or beaters. The material is driven by these beaters with great force against the perforated walls of the cylinder by the centrifugal force of the rapidly rotating beaters, and the fiber, eliminated by the friction of the hulls against the rough walls of the cylinder and against each other, is forced through the meshes of the cylinder, together with the finer parts of the hulls. The particles of hulls are supposed to fall by gravity to the bottom of the chamber while the particles of fiber are floated by an air blast to another place of deposit. The method upon principle does not differ materially from that of Bohn. There is the same comminution of hulls and fiber. This mass is forced through the meshes of a perforated cylinder, which answers to the screen of Bohn, and a separation of those particles which get through by gravity; the lighter particles of fiber being carried farthest by a current of air. This method was used under remarkably favorable circumstances by the American Stock Food & Fiber Company at St. Louis. The product was subject to the same objections as that produced by Bohn. Neither constituent was separated in its best condition.

The plan was abandoned for another. That substituted for it was the method of the patent of J. P. Burnham of July 31, 1894, No. 431,-391. This patent recognizes upon its face that the utility of the cotton fiber from cotton hulls is largely destroyed if the already short fibers of the lint are further shortened or ground up in the process of recovering them, and that the value of the hulls is also diminished if they are too finely ground up and the cotton lint not cleanly removed. To accomplish the separation without injury to either, Burnham avoided all grinding of hull or fiber and undertook to break or eliminate the lint from the hull by centrifugal action. It did not prove a commercial success, for the St. Louis concern soon ceased to do business and sold its plant to others, who did nothing with it. Under the Burnham process the hulls were not converted into bran, or, if so, by an independent and subsequent operation, for under his plan the lint was to be separated from the unground or unbroken hulls by a process of attrition which was not intended to break them up at all. The method of Burnham, whether workable or not, was not the process of Johnson, and his patent

is not an anticipating patent for that reason as well as because it had not been issued at the date of the Johnson application. Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68; Dubois v. Kirk, 158 U. S. 64, 15 Sup. Ct. 729, 39 L. Ed. 895; Anderson v. Collins, 122 Fed. 451, 58 C. C. A. 669.

The specifications of the Johnson patent betray a knowledge of the efforts theretofore made to produce a branless fiber and a fiberless bran from cotton seed and cotton hulls by mechanical means, and describes a process which he claims will accomplish the desired end by separating the two independent products in their best condition. The discovery he says consists "in breaking the hulls by attrition and concussion and then conducting the broken mass forcibly and rapidly into a separator which thoroughly separates the fiber from the hull and kernel." The mechanism suggested in which to employ his method, and the subject of the second or mechanical claim of his patent is shown below:

*Fig. 1.*

His description of his method is best understood when read in connection with the figure above set out. The patentee says:

"In carrying out my invention, I employ a rotary breaker or grinder, A, consisting of the disks, a, arranged vertically in close proximity and revolved rapidly in opposite directions by means of the shafts, $a^1$, $a^1$, carrying the pulley wheels, $a^2$, $a^2$. The seeds and hulls with the adhering fiber are fed to the breaker or grinder by means of a hopper, $a^3$. The disks are so constructed and arranged that the hulls and kernels are broken or split without cutting the fiber, and the revolutions of the two disks are such that the broken mass is

forcibly ejected into a separator, B, located directly beneath the breaker or grinder. This separator, B, consists essentially of a U-shaped trough, b, formed of some strong bolting or screening material, such as wire gauze, the mesh thereof being very fine. A rotary brush, B$^{u}$, is journaled within the said trough, said brush consisting of a series of oblique arms, b$^1$, carrying brushes, b$^2$, which contact with the face of the wire gauze or screen. As the broken hulls and kernels and fiber are received into the separator, the rapidly revolving brush forces them into contact with the wire gauze and carrying them around separates the fiber from the hull and forces said hulls and kernels through the mesh; and the fiber being restrained from passing through, is fed out at the end of the separator into a chute, C, by means of which it is led to a second breaker or grinder, D, similar to the breaker, A, except that the disks are arranged somewhat closer than in the first instance. The object of this second breaker is to break or grind any particles too large to be forced through the separator, B, and also to accomplish a further separation between the hulls and fiber. The hulls, etc., after passing through the second breaker, D, are received into a second separator, E, which is also similar to the one before described. The separated hulls, etc., which were forced through the first separator are received into a chute, C$^1$, and by that means conducted to the second separator, where they are given another treatment, so that every particle of fiber may be separated and a uniform grade of food stock produced. The finished product is then conducted to a bag or other suitable receptacle by means of a chute, C$^2$. The fiber has, by these various operations, been thoroughly separated from the hulls and kernels, and the operations have been such that the fiber has not been cut or injured, so that a uniform quality of long stock is obtainable which can be used in the manufacture of paper if so desired. The batting or wadding thus produced can be conducted directly from the second separator; but if a particularly fine quality of stock is desired, we lead it into a beater, F, consisting of a chamber, f, and a rotary beater, f$^{u}$, the revolutions of which are so rapid that the fiber is thrown upward toward a passage, f$^2$, and all dirt and impurities will fall of their own weight to the bottom of the beater. Connected with the passage, f$^{u}$, is a conductor which leads to the collecting room."

The two claims in issue are as follows:

"(1) The process herein described, which consists in first breaking the hulls and seeds by attrition or concussion and forcibly ejecting the mass into a separator, conducting the fiber to a second breaker and subjecting the same to a finer and closer grinding operation, and then forcibly ejecting the ground mass into a second separator, the bolted mass from the first separator being led also to this second separator and finally conducting the separated fiber away from the second separator, substantially as shown and described.

"(2) In an apparatus of the class described, the combination with the vertical rotary disks, a, a, of the horizontal separator, B, arranged beneath the same, the chute, C, leading from the end of separator, the chute, C$^{u}$, leading from the bottom of the separator, the second breaker, D, the disks of which are arranged closer together than the disk, a, of the first breaker, the horizontal separator, B$^{u}$, and the chutes for conducting the fiber and bolted material, substantially as shown and described."

The material to be dealt with was of a most difficult character. The fine, fuzzy fiber adheres very closely and stubbornly to the woody capsule. Johnson realized from his experience with the Bohn method, and his knowledge as a practical paper maker, the necessity of making the separation between the two constituents as clean as possible. As we have already seen under the methods of the old art, as illustrated by the Bohn patent and that to Burnett, Sears & Burnham, the hulls were subjected to grinding, whereby both hulls and fiber were ground into fine particles, so fine as to pass through the fine meshes of a screen or separator. The fiber was expected to pass with the bran through the

screen; a separation more or less thorough being made after so passing by an air blast. This method resulted in eliminating some of the fiber, but in such a comminuted condition and so commingled with the bran as to be of diminished value. Johnson's discovery was that, if the hulls were subjected to attrition as distinguished from grinding, two things would result: First, that more of the fiber would be cut loose from its attachment than by the other plan; and, second, that the detached fiber was separated in better condition, not being comminuted as by a technical grinding action. This being the condition of the material after a treatment by attrition, his next step was to separate the fiber so far as detached from the broken hulls with which it was commingled by means of a screening operation, whereby the fine bran is forced through the meshes of the separator. This fiber, by reason of its noncomminuted condition, he found did not pass with the fine bran through the meshes of his separator. This fiber, thus restrained from passing together with the particles of hull left in the separator, he subjects to a second treatment by attrition in a mill like the first, except that the disks are arranged closer together, the better to break the partly reduced hulls too large to pass the meshes of the separator and to further carry on the delinting process. The product of this second treatment, together with the material which passed through the meshes of the first separator, he carries to a second separator like the first; this second treatment by screening effecting a more complete separation of the bran and fiber. The success of the whole method is thus made to turn upon successive operations which avoid cutting the fiber while under treatment.

"The disks are to be so constructed and arranged that the hulls and kernels are broken or split without cutting the fiber."

The "fiber is restrained from passing through" the screen and is "fed out at the end of the separator." The means, method, or process constitutes a patentable process, consisting, as it does, of a series of treatments of a peculiarly obstinate material, each treatment having relation to the character of the material acted upon and to the condition produced by the preceding treatment. The result is the separation of the material into its two distinct constituents; the bran being substantially free from fiber and the fiber practically free from bran. Mowry v. Whitney, 14 Wall. 620, 20 L. Ed. 860; Cochrane v. Deener, 94 U. S. 780, 787, 24 L. Ed. 139; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968; Am. Fibre Co. v. Buckskin Fibre Co., 72 Fed. 508, 18 C. C. A. 662. In Mowry v. Whitney, cited above, a patent was sustained for a process for making cast iron wheels, by retarding their cooling by a second application of heat, until all parts of the wheel were raised to the same temperature and then permitting the heat to subside gradually. In Cochrane v. Deener, cited above, the patent was for a process of manufacturing flour, which consisted in passing the ground meal through a series of bolting reels composed of cloth of progressively finer meshes which passed the very fine flour and retarded the passage of certain impurities. It was held to be a patentable process. Defining a process, Mr. Justice Bradley in that case said:

"A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or not be new or patentable, whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."

In Am. Fibre Co. v.. Buckskin Fibre Co., cited above, this court sustained a process "for reducing fibrous sheets to a soft and pliable condition, consisting in first moistening them and then pounding while in a moist condition."

It is not enough to say that it was not new in milling to gradually reduce a material to its several constituents by a series of breakings and screenings. The breaking operations of Johnson were applied to a most peculiar material and the thorough separation of the fuzzy, silky lint from the capsules of the cotton seed, a most unusual and difficult operation. This delinting, in order to save the lint in its best condition, must be so done as not to cut it up. This last consideration was not presented in any of the gradual reduction processes known to the milling of grain. But not only did commercial considerations require the separation of the lint fiber without injury, but the successful separation of the detached lint from the commingled mass of broken hulls and fiber by the screening steps of Johnson would be practically unavailing unless the fiber reached the gauze screen of the separator without the comminution which resulted from the old methods of breaking the hulls. So it is that Johnson's successive screenings for successful results depend upon the method in which the antecedent operation of breaking has been conducted.

It is therefore no anticipation of his process to find a general resemblance in the fact of a series of successive breakings and screenings. Each breaking and each screening under his plan had regard to the peculiar material to be handled and its condition as a result of the preceding operation upon it. A process patent can only be anticipated by a similar process. Carnegie Steel Co. v. Cambria Iron Co., cited above. No such similar process has been shown, and the evidence leaves little reason to doubt either the novelty or great utility of Johnson's process as secured by the first claim of his first patent. Such a process may be wholly independent of the particular machinery or appliance used, and is something more than the functions of the machine in which it is employed. Am. Fibre Co. v. Buckskin Fibre Co., 72 Fed. 508, 18 C. C. A. 662.

This brings us to the patentability of the mechanism employed which is the subject of the second claim of the patent. The steps of the Johnson process may be carried out in any apparatus adapted to do the things in the order which he prescribes. The claim does not include any peculiar or novel form of disk, nor disks operated in any novel manner. The vertical rotary disk of the Cogswell mill, a device open to all and well known, were in fact used by him. The disks were, therefore,

confessedly old. The novelty is in arranging his disks so that the material to be acted upon shall be subjected to "attrition and concussion" rather than the ordinary method of grinding used by Bohn and by the Burnett, Sears & Burnham devices. But the construction and arrangement of the "vertical rotary disks" of the claim is described in his specifications only as one by which "the hulls and kernels are broken or split without cutting the fiber." That result is either a consequence of attrition as distinguished from grinding or we are not informed as to how it is attained. The arrangement, then, must be such as shall result in a mass of seed and hulls being rubbed against a similar mass and not against the hard grinding surface of the disk. This is a purely mechanical arrangement, presumptively within the competency of one skilled in this line of business.

The next step is the forcible ejection of the broken mass into a separator below. But this, too, is a result of the oppositely rotating disks at a suitable velocity. The separator described as "the horizontal separator, B," arranged beneath his mill, is not unlike in essentials of construction or function the separators of the old art. The rotary brushes journaled within the trough of the separator force the mass of broken hulls and fiber into contact with the screen or wire gauze forming its bottom, with the result of forcing the finer particles of hulls through the meshes, the detached fiber or lint, being "restrained" from passing through, "are passed out at the end of the separator" into a chute there placed leading to a second mill. This second mill is like the first, except that the disks are arranged closer together, so as to break up any particles of hulls which were too large to pass through the screen of the first separator, and also to "accomplish a further separation between the hulls and fiber." The material reaching the second mill is now subjected a second time to attrition and conducted to a second separator like the first. To this second separator the broken hulls which passed through the screen of the first separator are conducted by a properly arranged chute, and, together with the larger particles or hulls which had failed to pass through the screens of the first separator, are given a second treatment like that of the first separator, "so that every particle of fiber may be separated and a uniform grade of food stock produced."

Now, the essential difference between what Johnson does and what Bohn and others were doing consists in the fact that the separation between the fiber and the broken hulls occur, or is intended to occur, in Johnson's device as a result of forcing the bran through the meshes, leaving the fiber behind, while in the older devices the separation occurs after both hulls and fiber have passed through the screen, the hulls dropping by gravity into one receptacle, while the fibre, so far as detached, is carried by an air blast to a more distant place of deposit. It cannot be denied that all of the elements which enter into Johnson's combinations are old, nor that the function of each element in the new combination is substantially what it was before combined. That the combination and arrangement is not that of any former device for separating cotton seed or hulls from the attached fiber may be conceded. But it is difficult to see that these elements, when combined, constitute anything

more than an aggregation in which each element accomplishes a distinct result without co-operation with any other.

In Goodyear Rubber Co. v. Rubber Wheel Co., 116 Fed. 363, 370, 53 C. C. A. 583, 590, we said:

"The here bringing together of old parts, allowing each to work out its own effect without producing some new machine or product, is not invention. A combination of old elements, to be patentable, 'must produce a different force or effect or result, in the combined forces or processes, from that given by their separate parts. There must be a new result produced by their union; if not, it is only an aggregation of separate elements.' Reckendorfer v. Faber, 92 U. S. 347–357, 23 L. Ed. 719. 'In a patentable combination,' said Mr. Justice Matthews, speaking for the court in Pickering v. McCullough, cited above [104 U. S. 310, 26 L. Ed. 749], 'of old elements, all the constituents must so enter into it as that each qualifies every other. * * * It must form either a new machine of a distinct character and function, or produce a new result due to the joint and co-operating action of all the elements, and which is not the mere adding together of separate contributions. Otherwise, it is only a mechanical juxtaposition, and not a vital union."

But we are further of opinion that the device of the patent does not involve a patentable invention. That no device in existence could be employed according to the method of Johnson we concede. A rearrangement of the parts of any known device would have been essential to carry out his method. But the fundamental discovery was that by subjecting cotton seed or hulls to a series of treatments by attrition and by screening the fiber was saved in its best condition. When he disclosed his process, he disclosed enough to enable any mechanic familiar with the art or industry to which this discovery belonged to construct the apparatus essential to the employment of the patented process. Thus his claim is for "the vertically rotary disks, a, a." Referring to his specifications, we find that these disks are to be arranged "in close proximity and revolved rapidly in opposite directions." But his disks are not novel in the arrangement and operation, so far as described. The details are left to the ingenuity of the one desirous of using his method. The "disks are so constructed and arranged that the hull and kernels are broken or split without cutting the fiber." Manifestly, as he has said that he broke the hulls by attrition, the arrangement must be one which will subject the material to attrition or we have no direction concerning the construction and arrangement of his disks so as to avoid cutting the fiber. The arrangement and construction of the disks, then, is one which is clearly within the common knowledge of a mechanic familiar with the art. There is nothing novel— that is, nothing involving invention—about "the horizontal separator, B." The fiber does not pass through its meshes because it has been detached in an uninjured condition and therefore is "restrained" from passing through the meshes of the separator, as it would do, along with the fine bran, if comminuted as usual when subjected to grinding as distinguished from attrition. We fail to find that the construction of an apparatus to employ the method of his process claim involved patentable invention. When he disclosed his plan for the treatment of the peculiar material, its simplicity conveyed to any one skilled in the

industry all the knowledge necessary to supply it. We think, therefore, that the claims under both patents in issue are invalid for want of patentable novelty.

A vigorous effort has been made to show that Emil Bohn, of Galveston, Tex., the inventor of the two patents issued to Emil Bohn heretofore referred to, was the first and real discoverer of the process or method secured to Johnson by the first claim of his first patent as well as of the device of that patent. We have given attentive consideration to this contention, and are convinced that the whole defense is without any solid foundation whatever. Bohn was working upon the plan of his patent, and there is nothing in evidence which shows that he ever had any conception of the process of Johnson up to the time that he quit the service of Johnson and his associates; his method and his devices having proven commercially of little if any value. Certain it is that Johnson's process was not the method of Bohn's, and Johnson's device is not that of Bohn's patent. There is no evidence of serious import that Bohn ever made a plan or model or set up a device adapted to employ Johnson's process, or that he ever conceived of the complete reversal of his own methods which was necessary in the working according to Johnson's discovery.

We have rarely heard a case in which the evidence to show that a patentee was not the real inventor or discoverer of the patented process or means which is of so weak and uncertain a character as that presented by the present transcript. The alleged infringing device made and installed by the Foos Manufacturing Company for the Southern Cotton Oil Company at Memphis, Tenn., is a substantial duplication of the device of Johnson. It embodies that device with certain additions or modifications, wholly colorable in character. The Foos Company were, upon the evidence in this record, familiar with the device employed by the Tennessee Fiber Company for employing the method of Johnson's patent, and had themselves constructed parts of it, and were familiar with the mode of operating the complete plant. This knowledge they utilized by building and installing a plant substantially similar, adapted and intended to be employed according to the process or method of the Johnson patent. This was done and their purpose of supplying plants avowed because they did not regard Johnson's patent as valid. In this they erred.

They have infringed the process of Johnson because they supplied the apparatus adapted to employ Johnson's process with intent that the plant should be or would be operated as that put in for the Tennessee Fiber Company. It was therefore guilty of contributing to the infringement of the first claim of the Johnson patent. Heaton Peninsular Button Co. v. Eureka Specialty Co., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728; Thomson-Houston Electric Co. v. Ohio Brass Co., 80 Fed. 712, 26 C. C. A. 107.

The complainants are entitled to a perpetual injunction. The decree dismissing the bill must be reversed, with the costs of both courts, and remanded, with direction to enter a decree in accord with this opinion and for such further accounting as may be deemed necessary.

## On Rehearing.

This case comes on now to be heard upon a petition to disallow all costs under sections 973 and 4922, Rev. St. [U. S. Comp. St. 1901, pp. 703, 3396], and to modify the opinion of the court in respect to the scope of the Johnson's process claim. The suit was upon two patents. The first included three claims, one for a process and two for a mechanism by which the process might be employed. We sustained the process claim' as valid and found infringement. Only one of the mechanical claims was in issue, and that only was passed upon. That we held invalid as not involving invention. The second patent contained four claims for improvements upon the mechanical claims of the first patent, but only two were in issue, and those were held invalid as not involving invention.

It is now insisted that as the complainant did not, before suit, file a disclaimer in the Patent Office of the claims found to be invalid, no costs should be recovered by the appellant patentee in this court. Sections 973 and 4922, Rev. St., read as follows:

"Sec. 973. When judgment or decree is rendered for the plaintiff or complainant in any suit at law or in equity, for the infringement of a part of a patent, in which it appears that the patentee, in his specification, claimed to be the original and first inventor or discoverer of any material or substantial part of the thing patented, of which he was not the original and first inventor, no costs shall be recovered, unless the proper disclaimer, as provided by the patent laws, has been entered at the patent office before the suit was brought."

"Sec. 4922. Whenever, through inadvertence, accident, or mistake, and without any willful default or intent to defraud or mislead the public, a patentee has, in his specification, claimed to be the original and first inventor or discoverer of any material or substantial part of the thing patented, of which he was not the original and first inventor or discoverer, every such patentee, his executors, administrators and assigns, whether of the whole or any sectional interest in the patent, may maintain a suit at law or in equity, for the infringement of any part thereof, which was bona fide his own, if it is a material and substantial part of the thing patented and definitely distinguishable from the parts claimed without right notwithstanding the specifications may embrace more than that of which the patentee was the first inventor or discoverer. But in every such case in which a judgment or decree shall be rendered for the plaintiff no costs shall be recovered unless the proper disclaimer has been entered at the patent office before the commencement of the suit. But no patentee shall be entitled to the benefits of this section if he has unreasonably neglected or delayed to enter a disclaimer."

The effect of these provisions is to save the claims which are valid if they are definitely distinguishable from those parts of the patent claimed without right, whether there has been a disclaimer or not. But, if there has been no disclaimer entered in the Patent Office before suit brought, it is specifically provided that the patentee shall not recover any costs. O'Reilly v. Morse, 15 How. 120, 121, 136, 14 L. Ed. 601; Seymour v. McCormick, 19 How. 97, 107, 15 L. Ed. 557; Gage v. Herring, 107 U. S. 640, 646, 2 Sup. Ct. 819, 27 L. Ed. 601; Metallic Extraction Co. v. Brown, 110 Fed. 665, 49 C. C. A. 147; Fairbank v. Stickney, 123 Fed. 79, 59 C. C. A. 209; and Kahn v. Starrels (C. C. A.) 136 Fed. 597; Ide v. Thorlicht, 115 Fed. 137, 150, 53 C. C. A. 341.

But does the statute apply to this court when the trial court has erroneously denied relief upon those claims of the patent which were in

fact valid? The decree of the court below, when all the claims are found invalid, is, as in the case now before us, a judgment dismissing the bill with costs. To set aside such a judgment or decree, and obtain relief upon the claims that had been erroneously held void, a proceeding in error is necessary. If the result of such review is to convict the trial court of error, and the case is remanded for further proceedings in conformity to the opinion of the Supreme Court, shall the successful appellant pay his own cost? If the mandate of this court requires the trial court to enter a decree sustaining some parts of the patent and finding infringement, the statute will then have application and the patentee will not be allowed his costs because he had not entered his disclaimer before starting his suit and has put the defendant and the public to the disadvantage incident to his having asserted certain parts of his patent without right. We are not satisfied that either section applies to a decree of this court where the decree of the court below is found erroneous, and that court is directed to enter a decree sustaining some of the claims of the patent in suit. If that court had rendered the proper decree, the patentee would not have been compelled to come here to obtain that measure of relief to which it is found he was entitled. It would be a harsh rule which would not allow him to recover the costs of his appeal from an erroneous decree so far as relief was denied upon the claim of his patents which were good because success has not attended the whole of his contention.

In equity causes this court directs the imposition of costs according to the circumstances, and apportions them or denies cost altogether by no iron-clad rule. Indeed, such a rule could not be well prepared, and would more often than otherwise lead to injustice. Northern Trust Co. v. Snyder, 77 Fed. 818, 23 C. C. A. 480. The real substantial value of the Johnson patent consisted in its process claim. Over that the conflict raged. The mechanism by which it was to be employed was found not to involve invention, because we found that, "when he disclosed his plan for the treatment of the peculiar material, its simplicity conveyed to any one skilled in the industry all the knowledge necessary to supply it." Much of the record was made up of evidence endeavoring to show that Johnson was not the discoverer or first inventor of his process. In such circumstances we do not feel that the statute requires this court to deny the appellant his costs in this court. This is the view taken by the Circuit Court of Appeal of the Third and Seventh Circuits. Kahn v. Starrels (C. C. A.) 136 Fed. 597; Ide v. Thorlicht et al., 115 Fed. 137, 150, 53 C. C. A. 341.

We are aware of the fact that in O'Reilly v. Morse, 15 How. 60, 120, 124, 14 L. Ed. 601, the order shows that neither party recovered costs in the Supreme Court. But in the later case of Seymour v. McCormick, 19 How. 96, 106, 107, 15 L. Ed. 557, it appears that there were five claims in McCormick's patent, but that infringement of only the fourth and fifth was charged. It was, nevertheless, urged below that one of the claims not in issue was invalid, and that there could be no recovery upon the good claims in issue because there had been no disclaimer of the invalid claim. The court below held that all the claims of the patent were valid and that the fourth and fifth had been infring-

ed.. The Supreme Court held that one of the claims, not in issue, was invalid; affirmed the decree of the court below as to the other claims; but directed that it be corrected as to costs, so as to allow neither party costs in court below. But the costs of the Supreme Court were all taxed to the appellant. If the statute had been regarded as applying, neither party would have recovered such costs.

The direction that the costs of this court will be paid by the appellee we adhere to. The court below will, however, disallow costs incurred in court below prior to decree upon mandate of this court. We give no direction touching future costs, if an accounting be had. The court did not hold that Johnson was the first to use attrition as a method of separating cotton lint from the hulls, and no such discovery was necessary to sustain Johnson's process claim. His discovery consisted in his method of applying attrition through a series of successive operations; "such treatment having regard to the character of the material operated upon, and to the conditions produced by the preceding treatment." A verbal change has, however, been made in one paragraph, that no possible mistake may occur as to what we found Johnson's invention to be.