NATIONAL TUBE CO. v. AIKEN.

(Circuit Court of Appeals, Sixth Circuit. July 11, 1908.)

Nos. 1,765, 1,766.

1. PATENTS—INVENTION—TRANSFER OF DEVICE TO NEW ART.
The taking of a device from one industry and its application to a new use in another may constitute patentable invention when the original inventor never designed nor actually used it for the purpose to which it was later applied.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 31.]

2. SAME—AGGREGATION OF ELEMENTS.
The mere bringing together of old elements, which in their new places do no more than their original work and do not co-operate with other elements in doing something new and useful, is not invention; but, if they co-act with each other in a new and unitary organization so as to produce a more beneficial result than by their separate operation, it may constitute a patentable combination.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 27–29, 48.]

3. SAME—UTILITY OF DEVICE.
That a machine shall produce an original result is not necessary to patentability; but, if the new arrangement increases the effectiveness of the old by increased product or by lessening the cost, the fact affords evidence of invention.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 30.]

4. SAME—"PATENTABLE COMBINATION."
Where the elements brought together in a new organization co-operate to produce a single practical and useful result, it constitutes a patentable combination, and it is not important whether they act simultaneously or successively:

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 27–29.

For other definitions, see Words and Phrases, vol. 6, p. 5234.]

5. SAME—INFRINGEMENT—APPARATUS FOR COOLING AND STRAIGHTENING METAL PLATES.
The Aiken patents, No. 450,360, for an apparatus for conveying and cooling metal plates, and No. 492,951, for an apparatus for straightening metal plates, which embodies the substantial features of the earlier patent with additional devices, constituting a true combination, and not a mere aggregation of elements, were not anticipated, and both disclose patentable invention. Also, *held* infringed.

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

For opinion below, see 157 Fed. 691. See, also, 159 Fed. 1023.

James I. Kay and J. Snowden Bell, for appellant.
Marshall A. Christy, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. These two appeals have been heard together, as they were in the court below. The first case, No. 1,765, was for an infringement of patent No. 492,951, issued March 7, 1893, to the appellee, Henry Aiken. The other involves the infringement of patent No. 450,360, issued April 14, 1891, to the same inventor. The defendants in each suit are the same, and the infringement is a single structure which infringes both patents. The defenses are that pat-

ent No. 450,360 is anticipated by expired patent No. 369,154, issued August 30, 1887, to the same inventor, and that the latter patent, No. 492,951, includes no improvement constituting patentable invention over No. 450,360 and is for a mere aggregation. The court below sustained both patents and found both infringed. The opinion was by Tayler, District Judge, and is reported in 157 Fed. 691.

Both patents are for apparatus relating to the making of metal plates by rolling mills. The patent of 1893, upon which the first suit was brought, is entitled "An apparatus for straightening metal plates." The invention is described by the patentee in his specifications as "mainly" consisting:

"In the combination with a straightening press for the plates, of a conveying table or carrier which leads up to the straightening press lengthwise thereof, so as to bring the plates from the rolls to or in close proximity to the press; and also in the combination with devices, of a transfer mechanism adapted to shift the plates from the conveying table to the press."

The conceded fact is that the combination of this 1893 patent includes the entire device of the 1891 patent, with the addition of an interposed improved straightening press with suitable appliances for its operation in connection with the two parallel feeding and conveying tables. The 1893 patent is to that extent tributary to the 1891 patent, for it is not possible to use the entire device without using that of the earlier patent. The evidence, indeed, shows that the entire apparatus of the 1893 patent was conceived before either patent issued; but the inventor, having an order for a mill which did not desire the straightening press, made and patented those parts of his invention which covered his improved conveying and cooling tables, being the subject of his 1891 patent, and later applied for and obtained the patent of 1893. This is, however, not a matter of vital importance, for if the combination of the latter patent is a new combination and not a mere aggregation, and the results are new and useful in a patentable sense, the patent will stand, though every element is old. Nevertheless, it is difficult to justly estimate the advantages of the apparatus of 1893 without distinguishing between those which are attributable alone to that part of the device which is covered by the earlier patent and those which result only from the added straightening press. This comes about because the inventor divided his invention instead of patenting his entire invention in one patent. This division has also lent color and seriousness to the contention that the addition of a straightening press to the device of 1891 constitutes an aggregation and not a true mechanical combination. The solution of this question of aggregation will be facilitated if we shall first understand the device of the 1891 patent.

Aiken's first step in this matter of improving the methods for cooling hot metal plates is shown by his method patent of 1887. The patent has long since expired, and its only importance lies in the contention that the apparatus described therein for operating under Aiken's method, and the statements of the patentee as to a proper mechanism, constitute a disclosure which would enable any one skilled in the iron rolling business to have made the apparatus covered by Aiken's 1891 patent. The specifications of the 1887 patent disclose the prior methods for cooling plates. The patentee says:

"It has been a common custom heretofore to place these plates one on top of another in piles on the floor of the rolling mill or on cars as they come hot from the rolls, and to permit them to remain in such position until cool enough to be handled, when they were taken to the shears to be trimmed. As they are not rolled to a uniform size, but vary greatly in dimensions, the edges of some of the plates in the piles will extend beyond the edges of others, so that the center of the pile is built up solidly of hot plates, while the projecting edges of the larger plates are exposed more or less to contact with the atmosphere, which can gain no access to the middle portions of such plates. The result is that they cool unequally, and the edges become warped and distorted, and internal strains are produced which tend to weaken the plates and injure their quality. Such plates also require more shearing on this account, which produces a larger percentage of waste. When the plates are placed singly on the floor to cool, they are also liable to warp and buckle, owing to the fact that the air cannot obtain free access to the under side."

The method which Aiken proposed to substitute for the old and clumsy method was, as stated in the single claim of his patent, that of conveying the hot plates singly "through the atmosphere upon moving surfaces, where they are exposed to the atmosphere on all sides; the points of support constantly changing. * * *" To illustrate how this method might be carried out, he points out that, when the metal sheets or plates are delivered in the usual way from the rolls upon the usual rolling mill feeding table, there should be provided "adjacent to the table, upon which the plate is delivered after the last pass, and preferably in line with said feed table, * * * a roller table, of considerable length, terminating preferably at or near the shears." "This roller table," he says, "is a series of rollers at suitable distances apart operated by proper mechanism." An apparatus which he constructed before applying for his patent is shown and described. That apparatus was made for and long operated in the Homestead Rolling Mill. It was longitudinally a monster, 300 feet long, requiring, of course, very great space. One end connected with the usual feed table upon which the plates were first delivered from the rolls. The other terminated at the shears, where the jagged edges were to be cut off and the plates given the shape desired. Somewhere between the feed table and the shears, and after the plates had stiffened, they were to be stopped, and the lines marked to be followed by the shears. The operation, as he described it, was this:

"The plate, which usually leaves the rolls at a dull, red heat, is conveyed by the rollers of the feed table, c, to and delivered on the table, d. The rollers, f, being revolved at a slow speed, carry it slowly along the table to the shears, e. In its progress the plate is exposed to the air on all sides, and never being allowed to remain stationary it has no opportunity to bend or buckle by its own weight, even if at first hot enough to do so. The lines of impingement upon the rollers are constantly changing, and at most occupy but a small portion of the under surface, so that the underside of the plate is for all practical purposes as much exposed to the cooling influences of the air as the upper side. The result is that the plate cools uniformly on all sides, and the tendency to warp, buckle, and set up internal strains is obviated. If the plate is not sufficiently cooled when the end of the table is reached, the rollers may be reversed, and thus the plate be carried back and forth until sufficiently cooled. If the rolling is continued in the meanwhile, this reverse motion may be kept up until another plate comes from the rolls, then the forward motion may be resumed to receive the new plate. Usually there are a number of plates upon the table at a time, and there is sufficient intermission between the deliveries of the plates from the rolls to allow of considerable reverse travel, if necessary. In figure 3 I show a

plate, s, traveling over the table. It is not necessary that the table, d, should connect with the feed table, c. It may be at another place, and the plates be conveyed to it by any suitable means. Nor is it necessary that it should lead to the shears, but the economy and convenience of such an arrangement is obvious. Practical experience has demonstrated that my invention prevents buckling and warping and renders less trimming necessary."

In addition to the great space longitudinally required for a plant such as shown in the 1887 patent, impracticable in many mills, the tonnage capacity of such a mechanism was necessarily limited by its length. It could cool no more plates having a width of 30 inches than it could of plates of twice that width. As plates of varying width are rolled, it was economically important that the tonnage capacity of the apparatus for cooling and shearing should not be diminished when narrow sheets were to be rolled. To meet these objections, Aiken designed the apparatus of the 1893 patent, but divided his invention, as before stated, so as to include in his first patent only the improved arrangement for carrying and cooling such plates. The patent of 1891 is entitled a "Table for conveying and cooling metal plates." The patentee, in his specifications, says:

"The object of my invention is to provide means for conveying plates from the rolls to the shears at which their edges are trimmed, and for cooling them in their transit in such manner as to prevent them from warping and becoming distorted in shape, as they do when placed on the mill floor and allowed to cool there."

The apparatus described and illustrated comprises two conveying tables provided with driven rollers and extending substantially parallel to each other in opposite directions, one table leading from the rolls, and the other to the shears, with transfer mechanism adapted to transfer the plates from one table to the other. The patent says:

"The plates are moved along these tables by the transfer mechanism, preferably step by step, so that they cool gradually with both surfaces exposed to the air and are delivered at the shears in condition to be trimmed."

The claims are for a combination with "rolls adapted to roll metal plates and a rolling feed table," of conveying tables adjacent to and independent of the feed table, adapted to receive the metal plates therefrom, with transfer mechanism adapted to transfer them from the first to the second table. A short statement of this invention is that the inventor divided the long carrying table of the 1887 patent into two parts, placing the two tables adjacent and parallel to each other, and provided a transfer mechanism by which the cooling plates might be slowly transferred from one to the other. It may not seem a particularly long or important step in the art, but the results are shown to have been highly beneficial in the saving of time, labor, and space. The new arrangement of the cooling tables with traveling transfer chains between and connecting made the tonnage capacity for cooling and shearing uniform, whether the plates were wide or narrow, for the sheets or plates when partly cooled were delivered sideways onto the traveling transfer chains, and then onto the second table. Thus the capacity was the lateral and not the longitudinal space of the apparatus.

The suggestion, quoted above from the specifications, that the first of the cooling tables of the patent need not connect with the feed table.

163 F.—17

or lead to the shears, but that the plates might be conveyed to it by "any suitable means," is said to be a suggestion of parallel tables; but, if so at all, it is a long shot and points out none of the advantages of such an arrangement nor of the means for transferring plates while cooling. Nor was the intimation calculated to induce effort in that direction, for the patentee concludes by commending the economy and convenience of the connection he has adopted as the best. Certain it is that, however obvious the advantages of the new arrangement may now appear, no one made it or seemed to think of it until Aiken designed the mechanism of his 1891 patent.

The Aiken method patent of 1887 is the only prior patent which describes any mechanism for conveying and cooling long, thin plates of hot metal. That was a first and useful step in the development of apparatus for that purpose; but its advantages were limited, as it could treat simultaneously no more narrow plates than wide ones, and, second, by the great space such a plant required for operation. It is true that the patentee does not specifically mention this first advantage, but it is one inherent in the form and operation of his apparatus and is one of those advantages which is included in his statement, that, aside from a saving of space, his apparatus "is otherwise of great convenience." To provide for the transfer from one table to another of such long, thin, hot plates, and at the same time continue a uniform cooling without distortion, involved an adaptation of methods of transfer to the purpose desired which was not so simple as to justify the contention that he displayed only the ordinary skill of a mechanic. Speaking of this arrangement, Mr. Bentley, one of the appellant's experts, says that Aiken—

"makes use of this arrangement to receive the plates as they come red hot from the rolling mill on the feed table; then to lift and transport them laterally by the chains at such slow rate that the plates will become cooled in transit; then delivers them to the second set of feed rolls at the opposite end of the chain conveyor; and finally propel them by the second set of feed rolls to the shears where they are to be cut up in the desired lengths."

Thus the function of the transfer mechanism is in part to clear the first table, making room for succeeding plates by continuing the cooling process by the slow backward and forward movement of the conveying chains. True that the patent states of the first cooling table that the "plate may be carried back and forth by rotation until it stiffens"; but this is only a step toward cooling, for that is continued upon the traveling chain conveyors in the space provided for its occupancy until dropped upon the second table to be there further cooled, and all this without manual handling and so uniformly as to avoid warping. The reference to sundry sawmill patents, showing conveying tables and driven chains extending between them for transferring logs or lumber from one table to the other do not show anticipations. There is little analogy between the problem involved in conveying and transferring rigid, cold bodies from one conveying table to another, and that presented when the subject is long, flexible sheets of hot metal, which must be cooled uniformly and without warping while the carrying and transferring is going on. Cooling by exposure to the atmosphere involves constantly changing points of support. The log sawing art taught little or nothing that was pertinent either

in respect to the construction or arrangement of conveying tables or the proper mechanism for transferring such hot plates from one table to another. We must not be misled by the apparent resemblance between a device taken from one industry and applied to a new use in another when the original inventor never designed or actually used the device for the purpose to which it has been put.

In Potts v. Creager, 155 U. S. 597, 607, 15 Sup. Ct. 194, 198, 199 (39 L. Ed. 275), Justice Brown said:

"Indeed, it often requires as acute perception of the relation between cause and effect, and as much of the intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo. And this is not the less true if, after the thing has been done, it appears to the ordinary mind so simple as to excite wonder that it was not thought of before."

In Western Electric Co. v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670, 35 L. Ed. 294, a patent was upheld where one took a torsional spring, such as had been previously used in clocks, doors, and other articles of domestic furniture, and applied it to telegraph instruments; the application being shown to be wholly new. Nevertheless, the general rule undoubtedly is that it is not invention to apply an old device to a new use which involves no change in mode of application, as in Stearns & Co. v. Russell, 85 Fed. 218, 29 C. C. A. 121; but in that case the function of the pill dipping device in picking up and holding pills by suction was precisely the same as where it was employed in picking up and holding pieces of iron, cloth, or paper, and no structural change was needed to adapt it to doing with pills what it had before done with other materials.

In Heaton-Peninsular Button-Fastener Co. v. Elliott Button-Fastener Co. (C. C.) 58 Fed. 220, a principle was laid down which we think applicable to the claim that the invention of the sawmill patents referred to is an anticipation. In that case Justice Brown said:

"Doubtless, a patentee is entitled to a monopoly of his invention for all purposes; but where it is designed for a particular purpose, and another has taken it, and. by certain changes in its construction, has adapted it to an entirely different purpose, the evidence of its original adaptation for such new purpose ought to be reasonably clear and convincing to deny the improver the benefit of a patent for such new adaptation."

In Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, it was said:

"It is not sufficient to constitute an anticipation that the device relied upon might by modification be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used for the performance of such functions."

In Potts v. Creager, 155 U. S. 597, 606, 15 Sup. Ct. 194, 198 (39 L. Ed. 275), speaking of the adaptation of an invention in one branch of industry to use in another, the court said:

"But where the alleged novelty consists in transferring a device from one branch of industry to another, the answer depends upon a variety of considerations. In such cases we are bound to inquire into the remoteness of relationship of the two industries, what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to

require clearer proof of the exercise of the inventive faculty in adapting it to the new use, particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to an industry but remotely allied to the other, and the effect of such transfer has been to supersede other methods of doing the same work, the court will look with less critical eye upon the means employed in making the transfer. Doubtless, a patentee is entitled to every use of which his invention is susceptible, whether such use be known or unknown to him; but the person who has taken his device and, by improvements thereon, has adapted it to a different industry, may also draw to himself the quality of inventor."

The most that can be said about these sawmill patent references, as well as those which show methods of handling and transferring hot masses or billets of metal, such as the Daniels patent, No. 369,503, is that they teach something in respect to the means for handling or transferring materials in which neither warping nor distortion is to be guarded against, and rapidity of movement therefore desirable, but nothing of any high degree of pertinency when the material to be carried or transferred consists of long, flexible, red-hot sheets of metal, which must be uniformly cooled in course of travel without warping and by atmospheric exposure. None of the patents referred to show or describe a slow step by step transfer or carrier. Indeed, in the billet pusher patents, rapidity of movement to avoid cooling was essential. The reference to both class of patents is too remote to deprive the patentee of the benefit of his invention in adapting to his use mechanism from other arts which was never designed or used for the purposes of the patent in suit.

We come now to the patent of 1893. The specifications state:

"The object of my invention is to provide convenient apparatus for plate-mills, by which the metal plates, after they have been delivered from the rolls, can be straightened and removed from the straightening press, without the difficult and tedious hand labor heretofore employed in straightening and handling them."

The nature of the invention is then generally stated as follows:

"To this end my invention consists mainly in the combination with a straightening press for the plates, of a conveying table or carrier which leads up to the straightening press lengthwise thereof, so as to bring the plates from the rolls to or in close proximity to the press; and also in combination with such devices, of a transfer mechanism adapted to shift the plates from the conveying table to the press. It also consists in an improved straightening press and in certain other combinations and features of construction hereinafter described. The advantages of my invention will be appreciated by those skilled in the art. It results in a saving of labor and time in the straightening of the plates and thus is a means of economy and profit to the manufacturer."

It is contended: That the patentee has here brought together the carrying tables and transfer devices of his first patent and placed between his tables a straightening press by means of which the hot plates are straightened as an independent incident of their travel from the rolling mill feed table to the shears; that no new or useful result is accomplished, and no invention involved in the juxtaposition of the parts; that, in short, the device is a mere aggregation in which the old devices do in their place the work they did before being brought together. The mere bringing together of old elements which in their new places do no more than their original work and do not co-operate

with other elements in doing something new and useful is not invention. Thatcher Heating Co. v. Burtis, 121 U. S. 286, 7 Sup. Ct. 1034, 30 L. Ed. 942; Richards v. Chase Elevator Co., 158 U. S. 299, 15 Sup. Ct. 831, 39 L. Ed. 991. We have applied the same principle more than once. Campbell Printing-Press & Mfg. Co. v. Duplex Printing-Press Co., 101 Fed. 282, 41 C. C. A. 351; Goodyear Tire & Rubber Co. et al. v. Rubber Tire Wheel Co., 116 Fed. 363, 53 C. C. A. 583; Johnson et al. v. Foos Mfg. Co., 141 Fed. 73, 72 C. C. A. 105.

If, however, the adaptation of old and separate elements, so that they co-act with each other in a unitary organization, involves the exercise of something more than the skill of an ordinary mechanic, the result may be patentable, if a more beneficial result is effected than by the separate operation of the parts. Thatcher Heating Co. v. Burtis, 121 U. S. 286, 295, 7 Sup. Ct. 1034, 30 L. Ed. 942; Overweight Elevator Co. v. Vogt Machine Co., 102 Fed. 957, 43 C. C. A. 80. So if a new combination and arrangement of old elements produces a new and beneficial result, as to greatly increase the productive efficiency of a machine, it is evidence of invention. St. Louis Flushing Co. v. American Flushing Co., 156 Fed. 574, 84 C. C. A. 340; Muller v. Tool Co., 77 Fed. 621, 23 C. C. A. 357; Star Brass Works v. General Electric Co., 111 Fed. 398, 400, 49 C. C. A. 409; Loom Company v. Higgins, 105 U. S. 589, 26 L. Ed. 1177.

We are not impressed with the argument that the combination claims of this patent show a mere juxtaposition of the different parts there assembled. The claims are not for a combination of the earlier patent with any straightening press, however made or combined. They are for a combination of the conveying tables and transferring apparatus of the earlier patent with a specific, improved straightening machine, by specific means, pointed out as elements co-operating to produce a specific operative arrangement, the whole combined as and for the purposes described. The invention as described need not be set out in detail. First, there is a conveying table, comprised of feed rollers, driven by suitable gearing, which extends out from the table of the plate rolling mill. Second, extending parallel to this table is the bed of the straightening press, having a flat top on which the plate to be straightened is laid and, at the edge is a rib or shoulder, against which the edge of the plate is forced to remove the irregularities and curves usual in such plates as received from the rolls, and to reduce the edge to a straight line. Opposite the flange are a series of simultaneously movable heads, by which the successive plates are confined and straightened. Third, on the opposite side of this straightening press, and parallel therewith, a second conveying table upon which, after cooling and straightening, the plates are deposited, and by which they are carried to the shears to be cut into suitable lengths. Fourth, transfer mechanism extending clear across the machine from one table to the other and through specially provided gaps in the straightening bed, consisting of a series of vertically movable and horizontally traveling transfer chains.

The place of the straightening press in the old art was in line with the feed table. To place it between the parallel tables of the Aiken apparatus involved changes essential to its effective operation there which

appear to us to be beyond the ordinary skill of a mechanic. Now that it has been done, it may seem a matter of easy solution; but Aiken first saw the benefit to be derived from taking it out of the line of the feed rolls and placing it alongside. In that place the plates reached it before becoming too rigid and while plastic enough to be edgewise straightened. In that place it was advantageously placed to permit a step by step operation to go on; the straightened plate giving way to succeeding plates as they came from the feeding table. The result is a unitary mechanism which has saved time and labor and has gone into general use as the standard cooling and straightening mechanism for metal plates and sheets. That a machine shall produce an original result is not necessary to patentability. If the new arrangement increases the effectiveness of the old by increased product or by lessening the expense, the fact affords evidence of invention.

In Loom Co. v. Higgins, cited above, it was said:

"It was a new and useful result to make a loom produce 50 yards a day where it-had never before produced more than 40; and we think the combination by which this was done, even if these elements were separately known before, was invention sufficient to form the basis of a patent."

In Star Brass Works v. General Electric Co., 111 Fed. 398, 400, 49 C. C. A. 409, 411, the change between the new and the old mechanism consisted only in changing the familiar contact spring or brush from one place and putting it in another, in a trolley structure. In that case, Judge Day, now Mr. Justice Day, speaking for this court, said:

"Is this invention, or only the obvious improvement which would suggest itself to a mechanic skilled in the art? It is too well settled to need extended citation of authorities to support the proposition that a new combination of elements old in themselves, producing a new and useful result, entitles the inventor to the protection of a patent. Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177. It may be true that Anderson has only taken the familiar contact spring or brush, and placed it in a protected position; but this change seems to have made the difference between a defective mechanism and a practical method of attaining the desired end. Where, as in this case, the departure from the former means is only small, yet the change is important, the doubt as to whether the inventive faculty has been exercised is to be weighed in view of the fact that the device in question has displaced others which had previously been employed for analogous uses, and this may decide the issue in favor of invention."

The argument that the straightening press does not act simultaneously with the other devices included in the combination, if true, is not enough to defeat the patent. If that device is so arranged with the other devices made elements in the combination as that each part co-operates to produce a single practical and beneficial result, it is not important that that final result shall have been produced by a simultaneous or successive action of the combined elements. Sanders v. Hancock, 128 Fed. 424, 63 C. C. A. 166; Stilwell-Bierce & Smith-Vaile Co. v. Eufaula Cotton Oil Co., 117 Fed. 410, 54 C. C. A. 584; Forbush v. Cook, 2 Fish. Pat. Cas. 668, Fed. Cas. No. 4,931.

Neither of the patents in suit cover mere aggregations, and in our judgment fall clearly within the principle of the cases last cited.

The decree sustaining the patents must be affirmed.