CROWN CORK & SEAL CO. OF BALTIMORE CITY v. STERLING CORK & SEAL CO.

(District Court, N. D. Ohio, W. D. January 14, 1913.)

No. 2,247.

1. PATENTS (§ 328*)—INFRINGEMENT—BOTTLE SEALING MACHINE.

The Painter patent, No. 638,354, for a machine for automatically sealing bottles, the essential feature of which is a pressure limiting mechanism to prevent the breaking of the bottles by excess pressure, held not infringed by a device in which the mechanism of the prior Penfield patent, No. 426,315, for a brick-pressing machine, was adapted to use in the bottle-sealing art, which required no more than ordinary mechanical skill.

2. PATENTS (§ 328*)—INFRINGEMENT—FEEDING MECHANISM FOR BOTTLE SEALING MACHINES.

The Painter & Hawkins patent, No. 643,973, for an apparatus for feeding crowns or closures to bottle-sealing machines, claim 2, in view of the of rejections and requirements of the Patent Office, acquiesced in by the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

patentees, is limited to the apparatus substantially described in the specification which is a combination structure. As so limited *held* not infringed.

3. PATENTS (§ 246*)—INFRINGEMENT—PATENT FOR COMBINATION.

A patent for a combination is not infringed if any element claimed in the combination is omitted.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 387; Dec. Dig. § 246.*]

In Equity. Suit by the Crown Cork & Seal Company of Baltimore City against the Sterling Cork & Seal Company. On final hearing. Decree for defendant.

R. H. Parkinson, of Chicago, Ill., James O. Rice, of New York City, and E. G. Baetjer, of Baltimore, Md., for plaintiff.

Bakewell & Byrnes, of Pittsburg, Pa., for defendant.

KILLITS, District Judge. With the usual allegations necessary to raise the issue complainant sues on two patents, one granted to Painter, its assignor, in 1899, No. 638,354, on a machine for automatically sealing bottles, and one granted in 1890, to Painter & Hawkins, No. 643,973, on an apparatus for feeding crowns or closures to bottle-sealing machines. It is admitted that the inventions embodied in these patents are capable of and are in joint use in the art of sealing bottles with the well-known Crown device; a tin cap with a cork lining.

The defendant owns patents for caps or crowns, for method of sealing, and for sealing heads to be used on bottle capping machines, and has attempted to adapt to the use of its patented devices and methods alleged old constructions for limiting sealing pressures, to prevent breakage of bottles by excess pressure, and for feeding caps in right position to the sealing head.

In the issue before us is involved neither a basic patent for sealing by crowns nor the idea of transferring yielding plungers to release pressures to a new art. Painter's expired patent of 1892 opened the art of sealing bottles by stoppers of the sort in question, and his patent of 1898, No. 609,209, introduced into the art a pressure-limiting device, transferring thereto an old hydraulic mechanism. But for the patents sued on the field is open to the world, except as limited by the hydraulic patent of 1898, as to which no question is raised.

It is agreed that complainant rests its charges of infringement upon its rights under claims 4, 5, and 6 of patent No. 638,354, and claim 2 of patent No. 643,973. These claims, as applied to the first patent, read:

"4. In a machine for applying closures to bottles, a pressure-limiting mechanism comprising a support for the bottle, a spring held under an original predetermined compression, a tripping mechanism and means for automatically operating the same when said predetermined pressure is reached, substantially as described.

"5. In a pressure-limiting mechanism for bottle-sealing machines, a support for the bottle, a compound cylinder, a spring between the two members thereof, said spring being given an original predetermined compression and means substantially as described for releasing said compression when said predetermined

limit has been reached, by allowing one member of said compound cylinder to slide within the other to shorten the same as a whole, substantially as described.

"6. In a pressure-limiting mechanism for bottle-sealing machines, a bottle-support, a compound cylinder, a spring between the two members thereof held under a predetermined compression, a tripping device for automatically releasing said predetermined compression consisting of a pair of tripping-dogs pivoted to one member of said compound cylinder, and means carried by the other members of said compound cylinder for actuating the dogs, whereby said compound cylinder will become automatically shortened as a whole when the predetermined pressure applied to the bottle resting thereon be automatically released, substantially as described."

Claim 2 of the second patent alleged to be infringed herein reads:

"2. In an automatic feeding apparatus for bottle-sealing machines, a hopper for the indiscriminate reception of the crowns or closures, a chamber external to said hopper, an inclined bottom to said hopper adapted to lead the closures to said external chamber and a receptacle or cage rotating within said external chamber, having one side closed and a central opening in the side adjoining said hopper, adapted to receive the crowns or closures indiscriminately from the hopper, and containing in its periphery suitably-formed passages such that the crowns or closures can pass therethrough in one position only; whereby, by the tumbling action of said cage, the crowns or closures are changed in position therein until they present themselves in proper position to pass through said passages into a surrounding channel-way, substantially as described."

Although the answer pleads invalidity of the patents in suit, the case is presented almost wholly upon the question whether, under a proper construction of these claims and in view of the prior art applied to limit them, defendant's several constructions under attack do infringe. For the purpose of the court at this time it is sufficient to consider the question of infringement only.

[1] Confessedly, yielding pitmen or plungers are very old devices employed in many arts. Patents have been granted for specific forms to be used in pressing glass, molding brick, making coal briquettes, for mower and reaper cutter bars, and to accomplish many other results. So important a place in mechanical arts does such an appliance occupy that the Patent Office is said to have made a separate classification for inventions thereof. In this opinion it would be unprofitable to discuss the many variations and many patented forms pleaded, as counsel on both sides in briefs and oral argument treat the Penfield device, expired patent No. 426,315, for molding brick as defendant's substantial reliance to avoid charge of infringement of the first patent in suit. If it may be seen that defendant's construction for releasing pressure before the damaging point is reached substantially and lawfully adapts to the art of bottle sealing the Penfield release, this feature of the controversy before us is over in defendant's favor, for we are content to rest upon the assurance of counsel for complainant that the Penfield device does not "show any mechanism or any combinations corresponding to the patent in suit or any analogous combination."

In the margin we show the tripping devices patented by Painter and Penfield and that employed in defendant's machine,[1] with the notations and description used in complainant's brief. The similarity

[1] See note at end of case.

between the defendant's tripping mechanism and that of Penfield is superficially striking when we ignore the fact that one is to be delicately constructed for rapid use in a process dealing with fragile subjects and the other is coarse and heavy in its application to slow processes and crass material. Complainant's counsel, indeed, says:

"This machine (Penfield's) presents some superficial resemblance to the spring mechanism of defendant's construction."

Apparent differences are: (1) Penfield's plunger operates downward, while defendant's plunger works upward. (2) Penfield uses no resetting spring, while in defendant's construction such a device is necessarily employed to put the face of the plunger in position to be acted upon by the machine's full power. (3) Where Penfield employs two lateral controlling springs defendant has four smaller ones employed in the same apparent office. These differences are not radical. Complainant's hydraulic patent employed a downward acting plunger, and in one of that sort gravity operates to reset the device; doubling the number of pressure-controlling springs is merely a convenient noninventive division of labor. No issue can be raised upon any of these features of difference. It is well to note that neither of the claims of Painter's patent, No. 638,354, alleged to be infringed by defendant, provides for a resetting spring.

It is first urged by counsel for complainant, in criticising the reliance upon the Penfield device, that the uses are not analogous. In this, it seems to the court, counsel are failing to distinguish between the machines of which the respective devices are parts and the functions which those devices perform in their respective machines. There is little, if any, analogy between molding brick and capping bottles, just as there is little, if any, analogy between coating pills and lifting and delivering paper to a printing press. Stearns & Co. v. Russell, 85 Fed. 218, 29 C. C. A. 121. There seems to the court to be a close analogy between the function of a yielding plunger in a brick machine and that of a similar device employed in a bottle capper, just as it appeared to the court in the case cited to be a close analogy in the use of suction by the exhaustion of air to lift pills for dipping and the similar employment of a partial vacuum in delivering sheets of paper in printing. It is seen that in molding brick, as in affixing these crown seals to the bottle, it is desirable that a release of the pressure in advance of an undue increment thereof be provided for; hence the function of these devices in the two widely divergent arts is precisely the same, namely, the securing of release before the point of attaining disaster. The question is not affected, in our judgment, whether the result is to prevent breakage of the machine or crushing of the subject worked upon; the ultimate function of the yielding plunger is to save the machine's efficiency. The question then is: Would one ordinarily skilled in mechanics applicable to the art in question, having under observation the Penfield machine, readily apprehend, in respect to its provision for tripping the pressure, the latter's adaptability to the results he desires to obtain in the other art? Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275. We are constrained to answer this question in the affirmative.

But it is argued that in the Penfield machine:

"The releasing pressure is not determined by a spring or springs under original predetermined compression but is determined largely by the action of a variable force, with the result that the machine will not release at any given or predetermined pressure."

This seems to us to be hardly valid. Rather, it impresses us that, after a pressure is applied sufficient to overcome "static friction," the lateral springs in Penfield's machine will allow an increase up to the limit of their power of resistance, precisely as in either complainant's or defendant's devices. And while we will not dispute, but do doubt, that the Penfield machine "does not require an accurate release at an exact and predetermined pressure, it being enough to satisfy the requirements if the machine releases somewhere within a ton or so of the desired pressure," it seems clear that the pressure which will trip the mechanism, while probably not predetermined, is easily determinable and is fixed within approximately narrow limits by the tension of the springs themselves, and we also think we see in this construction the opportunity to set the machine to a predetermined pressure through adjustment of the nuts and washers holding the springs in place, precisely as in defendant's device the same result is obtained. This is so obvious as to involve little mechanical skill and no inventive genius in its comprehension.

Again, it is urged that in the Penfield machine as the pressure increases it is exercised increasingly by the blocks $E$ (which with their controlling arms $H$ correspond to the dogs $3$ of defendant's machine) upon their pivots, that "the friction between the blocks and pivots increases with pressure," and we are told that this friction, known as "static friction," which is defined as "the friction developed between two parts under a pressure applied in a single direction, the parts being relatively stationary at the time the friction is developed," is a distinctive accompaniment of the operation of the Penfield device. In this we cannot agree with counsel. Applying this definition of static friction to the operation of the constructions of both complainant and defendant, it seems to us that such friction, different in degree doubtless but not in quality and in fact, occurs in both. Each of these devices has pivots on which swing arms or dogs which bind increasingly upon their pivots and turn with more friction, therefore, with the increase in a single direction of the pressure of operation. Defendant's device has friction rollers, but that construction does not change the fact of the presence of this so-called static friction. They affect but the degree thereof. The use of friction rollers is so old and their application at this point so obvious that the fact affects the situation in no degree.

It is further argued that the Penfield device is "semiself-locking" because pivots $F$ are located close to the shoulders $D$ of the inner telescoping member, wherefore a certain amount of pressure is carried before the springs are called upon. This is manifest from an inspection of the device; but it seems to us, again, that something of a self-locking character is present in both complainant's and defendant's devices. Without the springs in complainant's machine a

certain amount of pressure could be exerted through the pivoted locking dogs *1–2*. Doubtless in a vertical position they would not be able to carry the weight of the superstructure. Horizontally, however, pressure up to the effect of friction of the parts would be sustainable through them, and the same may be said of the arrangement of defendant's device. The difference, again, is one merely of degree, due to a shifting of leverages readily discerned as an expedient to one of ordinary mechanical skill seeking to adapt a familiar mechanical contrivance to an art in which he is interested.

The answers of complainant's expert to certain crucial questions put to him in rebuttal cross-examination (pages 101, 102, Complainant's Record) were somewhat enigmatical. They were sufficiently plain, however, to suggest that his mind ran parallel with the court's to the point that the difference in functions of a tripping device or yielding plunger, whether the purpose be to protect the machine or the subject of the operation, is apparent rather than real, and that one of ordinary mechanical skill would readily see in the Penfield mechanism adaptability for use in tripping pressures in bottle-capping machines, and, with no substantial draft on his inventive faculty, would be moved to a refinement of their parts and their adjustment to adapt the complete mechanism for substitution for either complainant's or defendant's devices. If these conclusions are correct, and the language of the witness's replies, skillfully avoiding the categorical, seem to the court to be reluctant admissions, the question of infringement respecting the first patent demands a negative answer.

The principles which govern the questions immediately before us are so well settled and so clearly stated in sections *37, 38,* and *39,* Walker on Patents, that to cite case authority seems unnecessary. As was said in Herman v. Youngstown Car Mfg. Co., 191 Fed. 579–582, 112 C. C. A. 185, 188:

"The application of these rules to specific facts depends upon the force which those facts carry to those who determine the issue."

Granting that the art of pressing brick is clearly without analogy to that of capping and sealing bottles, yet the special purpose for which a yielding pitman is used in these two nonanalogous arts may be and is, as we have said, closely analogous. This is the crux of the case so far as issues are involved in the first patent and in defendant's reliance upon the Penfield mechanism are concerned. To go into a remote art for a tripping device is open to defendant because of complainant's use of the hydraulic release. If we are warranted in holding the analogy necessary to a defense to the broad function which a yielding pitman is to perform, rather than to involve in it, as complainant would have us, but the result in the particular operation which the exercise of that function effects, then Penfield's device is a safe foundation for defendant's structure. The proximate office of the yielding pitman in the two arts is to save the particular operation from the effect of too great pressure, and to render the machine efficient in the accomplishment of its purpose against inadvertent or casual stress. The analogy which must be seen to make a case of double use should be one which appeals to a person of ordinary mechanical skill. Courts

and text-writers have not improved upon Justice Brown's definition in Potts v. Creager, 155 U. S. 579, 608, 15 Sup. Ct. 194, 39 L. Ed. 275. The adaptability of the Penfield device to effect the purpose of a tripping pitman when the pressure became dangerous in a bottle-capping machine, we think, would readily occur to such a person when his interest in the latter art became engaged.

The distinction, therefore, which the court so clearly makes in Herman v. Youngstown Car Manufacturing Company, supra, between the alleged analogous uses of hydraulic cylinders and that involved in the invention under consideration by that court, does not, it seems to us, exist here. But one function is to be performed by the yielding pitman in Penfield's and in defendant's machine, namely, a tripping to prevent dangerous pressure. In either case the result occurs at a precise point, to wit, the overcoming of the resistance of the lateral springs. . This point in each device may be produced and regulated by substantially the same means, and the operation of the springs is initiated by substantially the same means. The respective parts seem to us to be so clearly mechanical equivalents as that, if such an issue were made, we would be obliged to say that as to this construction Penfield anticipated defendant. Assuming that the issue was upon defendant's claim for novelty in its tripping mechanism, we are satisfied that a reference to Penfield's patent would be sufficient for rejection. Again, it seems clear that the court which invalidated the Martin patent in Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856, would hold defendant to infringe Penfield, could such an issue be raised for its determination. Defendant's device seems at least as nearly equivalent to Penfield's as to Painter's. If that be so, there can be no infringement of Painter by defendant respecting the yielding plunger.

The difference, as we view it, between Penfield's and defendant's construction, is one of refinement of parts to adapt them to an office involving delicacy of operation and not found in the art of molding brick. It is obvious that some special adaptation of parts or arrangement to fit an old device to a new use accompanies the attempt to transfer, and we are of the opinion that it is only when such adaptation or refinement is so radical and original as to transcend ordinary mechanical skill alert for a device for a special purpose that invention follows. This situation does not obtain here. The changes from Penfield to the structure of defendant are those which seem to us would be obvious to one of ordinary mechanical ability engaged in scanning a remote art for a yielding pitman to be used in a bottle-capping machine.

We have no disposition to ignore the force of such decisions of our own Circuit Court of Appeals as those of National Tube Co. v. Aiken, 163 Fed. 254, 91 C. C. A. 114, and Herman v. Youngstown Car Mfg. Co., supra; but we assume that these cases are to be considered and weighed in their relation to other opinions of the same court, such as Stearns v. Russell, supra, affirmed, 171 U. S. 689, 19 Sup. Ct. 886, 43 L. Ed. 1179, Schreiber v. Grimm, 72 Fed. 671, 19 C. C. A. 67, and Bullock v. General Electric Company, 149 Fed. 409, 79 C. C. A. 229.

This Circuit Court of Appeals shows no disposition to depart in any substantial degree from its position in Stearns v. Russell, for in the Aiken Case, 163 Fed. 254, 259, 91 C. C. A. 114, 119, the court approves the principle of that case in this language:

"Nevertheless, the general rule undoubtedly is that it is not invention to apply an old device to a new use which involves no change in mode of application, as in Stearns & Co. v. Russell, 85 Fed. 218, 29 C. C. A. 121; but in that case the function of the pill dipping device in picking up and holding pills by suction was precisely the same as where it was employed in picking up and holding pieces of iron, cloth, or paper, and no structural change was needed to adapt it to doing with pills what it had done before with other materials."

In the Herman and Aiken Cases the patentees were pioneers in entering a remote art for a device which, with proper modification, would serve a purpose in the art in hand. Invention, in each case, inhered as much in the originality abiding in the thought that such remote art might contribute as in the adaptation of the contribution. No one before Herman had thought to seek among hydraulic devices for an escapement in making blueprints, nor had any predecessor of Aiken seen the possibility of adapting conveyors of such inert and rigid bodies as sawed lumber to the conveyance and support of red-hot and consequently flexible sheets of metal in a manner to cool them uniformly and without warping them as they approached the trimming shears. But when Painter patented the mechanism alleged to be infringed in this case, the art of bottle sealing by crowns had already invaded the art of yielding pitman, of which the known forms were many, and had made an appropriation therefrom. This was the result of the grant to him of patent 609,209, noted above. Whatever may be the merits of his invention, we find nothing in his grant which shuts the door of opportunity in some other inventor to go to the yielding plunger art for an old device of this character. This is not a case where the words of Justice Brown in Potts v. Creager, supra, apply, namely:

"Indeed, it often requires as acute a perception of the relation between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo."

For, when the patent now considered was issued, "acute perception" and "intuitive genius" of this character had been exhausted in the grant of patent 609,209. Nor is there here a fair opening for the application of the principle laid down in Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, that:

"It is not sufficient," in order "to constitute an anticipation" of a patented invention, "that the device relied upon might, by modification, be made to accomplish the function performed by the patent, * * * if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions."

Four patents are offered in evidence by the defendant, notably those to Creager (413,929) and Hall (448,231), both of which are expired, the first primarily for a yielding pitman and the second for a device of that character specially adapted for brick machines. In each of these

grants the specifications call attention to the adaptability of the invention "for analogous purposes in other mechanism"; the invention (Creager's) not being "limited to any particular use." In Creager's device weighted levers are employed to control pressure, which is tripped when the tension with which they hold certain compound levers is overcome. Not only does Creager call attention to the fact that lateral springs may be employed instead of these weighted levers, in which case springs would take the appearance and perform the function of those in the Penfield contrivance and defendant's, but he also provides for adjusting the tension (which, of course, involves an opportunity to predetermine it) by shifting the weights on the levers, surely an equivalent, mechanically, to the adjustment provided by defendant and possible in the Penfield trip through a shifting of the retaining nuts and washers on the outer ends of the springs. Hall also employs a lateral flat spring the tension of which is "regulated by a setscrew *1* taking through one of the links." These conditions of the yielding pitman art dispose, we think, of two points deemed by complainant's counsel important. It is urged that a "spring between two members," as in claims 5 and 6, means simply "that the spring shall be operatively between the two members," and that consequently defendant's lateral springs are within the claim. It would seem, likewise, that Hall's and Creager's springs were "operatively between" the members controlled by them; hence, at least, defendant, in this respect, is not using any novelty introduced by Painter. Again, it is urged that Penfield's machine does not suggest provision for adjusting tension. However that may be, this idea is offered by both Hall and Creager. As we consider their devices, there appears in them almost if not quite sufficient defense to defendant in the essentials of its tripping device independent of the Penfield reference.

We feel the problem involved in adapting either the Penfield, Hall, or Creager pitman to the use of defendant does not reach the complexity of that before Herman in modifying hydraulic resistance devices already known to work out his escapement, in the solution of which the court (191 Fed. 579, 582, 112 C. C. A. 185) found invention. Rather we consider the task before defendant's mechanic (who had at least constructive knowledge of the state of the yielding pitman art, Mast-Foos & Co. v. Stover, 177 U. S. 485, 493, 20 Sup. Ct. 708, 44 L. Ed. 856) to be more nearly comparable to that engaging Russell when he adapted from a remote art a device for lifting pills (Stearns v. Russell, supra). It is no new use of a yielding plunger which either complainant or defendant makes in their respective bottle-sealing machines. The use is identical and to the same end attending the employment of such devices elsewhere, wherefore this case is distinguished also from Western Electric Co. v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670, 35 L. Ed. 294.

The effect of the current of authority is well stated by the court in Webster v. Dunham, 181 Fed. (C. C. A. 8th Cir.) 836, 839, 104 C. C. A. 346, 349, in this language:

"It is only when the new use is so recondite and remote from that to which the old device and combination has been applied, or for which it was conceived, that its application would not occur to the mind of the ordinary me-

chanic skilled in the art. seeking to devise means to perform the desired function, with the old machine or combination before him, that its conception may rise to the dignity of invention."

[2] As we have suggested, Painter & Hawkins entered an old art when they applied for patent which appears in this case as No. 643,-973, and it appears that their application was attended with many difficulties and much modification in its passage through the Patent Office. Repeatedly their claims were rejected and as often did they acquiesce in the rejections and attempt to meet the reasons therefor by modifications and limitations.

Claim 2 in controversy must be, therefore, considered as to its scope with reference to this history. Campbell v. American Shipbuilding Company, 179 Fed. 498, 103 C. C. A. 122. In the case at bar, as in the case cited, the rejections and the requirements which the examiner made of applicants which they attempted to meet were based on references to specified patents which, in the judgment of the examiner, were sufficient to warrant his action, and here, as in the case cited, to use the language of the court:

"It is not necessary to examine those patents with any purpose either of defining the prior art or of otherwise justifying the action of the Patent Office. It is sufficient that Campbell (the applicants, in the case at bar) acquiesced in the rulings, instead of taking the prescribed course of appeal."

The court in the case cited quotes with approval the language of Judge Severens in American Stove Co. v. Cleveland Foundry Co., 158 Fed. 978, 86 C. C. A. 182, to the effect that the applicant under circumstances such as these "must be deemed to have surrendered and disclaimed what he conceded, and to have imposed such definitions upon the language of the patent as he attributed to it in order to secure the grant"; wherefore, to use again the language of the court in the Shipbuilding Company Case:

"It inevitably follows that the language into which the grant of the present patent was ultimately resolved must be interpreted with constant reference to the limitations and restrictions imposed and with respect to matters distinctly excluded through rejections and amendment."

Now, for the history of this claim 2 alleged to be infringed: Its elements are seen to be a hopper for the indiscriminate reception of crowns or closures, the inclined bottom thereto adapted to lead the contents to an external chamber, a receptacle or cage rotating within said external chamber, having one side closed (the side opposite to the entrance to the external chamber), and a central opening in the side adjoining said hopper, said rotating cage having in its periphery suitably formed passages for the passage of the crowns or caps in one position only, substantially as described.

The application, in the first instance, contained 11 claims. They were all rejected by the examiner for reasons given. In these claims the so-called external chamber was described as an "auxiliary chamber adapted to receive the crowns from the hopper." The rejection was acquiesced in and an amended set of four claims was offered, in which the auxiliary chamber was described as one "exterior to the hopper." These claims were rejected. Attempting to meet this situation, solicitor for applicants said:

"Replying to the examiner's last action, I beg to call attention to the fact that neither of the references show the chamber exterior to the hopper with the selecting cage rotating in vertical plane therewith."

To which the examiner replied:

"On reconsideration of this case at request of the applicant, it is repeated that Bennett discloses the *exterior auxiliary chamber*, while Gillette shows the very common employment of a vertical selecting cage and chute therefrom."

Thereupon applicant's solicitor requested the erasure of his four claims and permission to amend with two claims describing a vertically arranged hopper, a chamber external thereto, a selecting cage in said external chamber, and other details not necessary now to be discussed. Again a rejection occurred with the suggestion by the examiner that appeal be had, to which applicant's solicitor replied:

"After consultation with the applicants they came to the conclusion that the examiner's rejection of the former claims 1 to 4 was warranted, but it was thought that applicants were entitled to *more limited claims to the structure,* and so the claims 1 and 2 were proposed, to take the place of former claims 1 to 4."

Thereupon the case was reopened and the two claims then in question again rejected "as involving nothing whatever over Bennett taken with Gillette." To which the applicants respond:

"*The applicants believe themselves to be entitled to claims for their structure and are perfectly willing to define their structure to distinguish from the references and supposed that the first and second claims did this.* The attorney begs for a reconsideration of the claims in the comparison which he asks the examiner to make, and, if any further limitation seems to be necessary to avoid the references, it is asked that the examiner suggest this."

Replying, the examiner said:

"In response to applicants' request for an explanation of the references cited, it is stated that Bennett *discloses a hopper, a chamber external to the hopper, an inclined bottom to the hopper for feeding to the external chamber, and a selecting cage in the external chamber, the exterior portion O of the cage forming part of the front wall of the chamber,*" etc.

Whereupon the solicitor for the applicants asked for further consideration in view of certain facts suggested of which one is the allegation that "Bennett does not disclose a selecting cage in the external chamber," and, further, that "the claims now presented have also the elements of a *rotating selecting cage having one side closed and the other open.*" Accompanying this application are three amended claims, of which No. 2 is identical with the claim in question in this controversy. Upon this record these claims were allowed and patent granted.

. We are unable to consider this history without reaching the conclusion that the complainant here has a patent only for the structure substantially such as is described in the specifications of the patent. In view of the reference to Bennett and the acquiescence of the applicants therein, independent of other patents pleaded and brought to our attention in evidence, complainants have no issue with the defendant merely because the claim in question involves the use of an external chamber, for the record forces the patentees to admit that the use of such an intermediate container between the main hopper

and the selecting cage is not new; yet a great deal of this controversy and a large part of the argument depend upon the insistence of complainant that that portion of defendant's device which consists of a narrow neck or vertical passage from the main body of the hopper to the selecting cage is a chamber external to the hopper and, consequently, a "regulating chamber" because at the beginning of the constriction, which complainant assumes to be the bottom of the hopper, defendant has placed an agitating device (2–6–4–5) which serves, at least when stationary, to restrict the passage of the crowns from the upper portion of the hopper into this lower portion or neck, which leads through an opening in its side to the selecting cage. Assuming that this restricted portion below the agitator is substantially an auxiliary or external chamber, its relation to the main part of the hopper and the manner in which it is related to the selecting cage are so different from the arrangement of parts in complainant's device that the similarity is very obscure, and, if we may justly limit. complainant's claims to the structural descriptions in the specifications, there can be no conflict. This dissimilarity increases when we pass to a consideration of the claim for a selecting cage rotating within the external chamber, a feature of the claim which was urged upon the examiner as especially distinguishing the applicant's invention from Bennett's, because Bennett did "not disclose a selecting cage in the external chamber," and because "the claims now presented have also the elements of a rotating selecting cage having one side closed and the other open." Applicants' claims were distinguished from the anticipations alleged by the examiner in rejection, but very clearly defendant does not employ a selecting cage rotating in anything that may be said fairly to be an auxiliary chamber or one external to the hopper. It does not rotate within that portion of defendant's device which complainant insists is substantially an external chamber. Its action is wholly without any portion of the neck or restricted portion of the hopper, which complainant insists is practically an external chamber.

[3] In view both of its history and its language, this claim 2 must be held to be a combination claim for structure. It cannot be infringed when one important element is absent.

'A combination is an entirety. If one of its elements is omitted, the thing claimed disappears. Every part of the combination claimed is conclusively presumed to be material to the combination, and no evidence to the contrary is admissible in any case of alleged infringement. The patentee makes all the parts of a combination material, when he claims them in combination and not separately." Walker on Patents, § 349.

Nor has defendant's selecting cage one side open and one side closed. Both sides are open in fact, although intermittently and casually, as the circumstances require through the infrequent clogging of crowns, a part (7) which ordinarily is stationary, closing the outer side of defendant's selecting cage, partially rotates to free an offending crown. This device performs, in an unlike way, the function of a pendulum mechanism used by complainant (not shown in cut).

Again, the opening from the passage from the hopper into defendant's selecting cage is the full measure of that side of the defend-

ant's cage except as it is closed by a transverse bar or block (not shown in cut) having projections designed to lift or agitate the crowns in the chamber beyond; whereas complainant's selecting cage has a central opening as described with lifting projections on the periphery of the rotating cage. The arrangement of all these parts is very dissimilar. Devices of unlike characters are used to accomplish the several results desired. The defendant's construction seems to the court to be simpler, as it has less parts. In the margin we show the selecting construction of the parties hereto, taking the cut out of complainant's brief, and using the notation and description employed by it.[2]

In short, again, if the claim in question is to be limited to structure as described in the specifications, the divergencies are so marked between defendant's and complainant's structures as to leave no room for claim of infringement. In fact, as we have said, the greater portion of the argument submitted, orally and in brief, is upon the claim that defendant uses an external chamber, in the fact that the restricted vertical neck of the hopper, formed in one casting, is partially separated from the bowl of the hopper by the agitating device referred to, but this claim must be construed to be for structure only, and it must be considered as a whole. So considered, the device covered by it in the relation of its parts one to the other is not that employed by defendant. The two constructions may, of course, and do perform the same functions and the same intermediate results may be had to reach the final result; but that fact involves no infringement if the structures are substantially different.

It is unnecessary to discuss other patents pleaded as occupying the selector field. It is quite plain that, as to other features not by us here considered, both parties to this action are using elements or their equivalents found in the Muslar (531,001), Gillette (592,584), Campbell (577,643), and Dimock (278,320) patents, among others. In fact, working models of the Campbell and Dimock selectors have been exhibited to the court. With the addition of such an agitator as defendant uses, each of these appears to be fairly competent to perform the service rendered by either complainant's or defendant's selector. Nowhere in argument has there been any criticism advanced of the use by defendant of the parts *2, 6, 4, 5* to even the flow of crowns by agitating against bridging. It is only because, in complainant's opinion, these parts combine to separate the hopper's integral casting into two chambers, that the construction is objected to; but we are not invited to consider this result in any other way except broadly that an external chamber is formed. No similarity of structure other than is involved in the production of two chambers is urged; but for the employment of two chambers complainant cannot claim originality in view of the history of the application of Painter & Hawkins in the Patent Office.

Our conclusion is that, whatever may be the standing of either of the patents sued on, complainant has no cause of action under either against defendant for infringement, and that the bill should be dismissed.

[2] See note at end of case.

NOTE.—The following are the devices patented, with descriptions from the briefs:

COMPLAINANT'S RELIEF MECHANISM.

In the operation of the machine, as the anti-friction roll $e^1$ moves up the cam, the compound cylinder $e$, $e^4$, the parts of which cannot telescope because the dogs $i^2$ are engaging the beveled ring $i^4$, is pushed up, carrying the bottle with it, the bottle in its upward movement picking up the crown and forcing it into the metal die $k^6$. As the bottle and crown strikes the die, the die begins to force the crown down upon the bottle in order to seat it before the die bends the flange of the crown inward to lock it. The die, therefore, offers a resistance to the further upward movement of the bottle and crown. At this time, the roll $e^1$ is rolling up the cam and is pushing the cylinder $e$ upward. The upward movement of the cylinder $e$ causes an upward thrust of the rings $j$ and $i^4$, which are located in the bottom of the cylinder, and the force of this thrust is transmitted to the dogs $i^2$. These dogs, through the flange to which they are pivoted, transmit this force to the spring $j^4$. This spring, however, being under original predetermined compression, will not yield until the predetermined force is exercised upon it, and until this force is reached the spring transmits the force to the part $e^4$ against the bottom of which the spring bears. The parts of the device, therefore, move upward in the same way that they would if the compound cylinder was an integral structure instead of being a telescoping one. When the force of the upward movement reaches the 700-pound pressure limit which is required to cap the bottle, which will be at the time the crown is thoroughly seated and its flange bent in, the spring $j^4$ begins to compress. In other words, the resistance now offered by the die to the further movement of the bottle is greater than the original compression of the

spring, so that the spring yields. The part $e^4$ therefore ceases to move upward, being held against movement by the bottle and die, but the part $e$ continues its upward movement, because the roll is still moving up the cam. This causes the ring $i^4$ to move upward with respect to the locking button $i^1$, which remains stationary because it is connected to the part $e^4$. This upward movement of the ring carries the bottoms of the dogs above the top of the button and they then slip off the top of the ring and into the position shown in Fig. 2 of the drawings. As soon as this occurs no further resistance is opposed to the upward movement of the part $e$, except that offered by the comparatively light resetting spring $j^3$, and it therefore continues its upward movement until the roll reaches the top of the cam without exercising any further substantial pressure on the bottle, and, consequently, without further increasing the movement of the bottle with respect to the die or the pressure upon it.

*Diagram Defendants Machine.*

The defendant's mechanism includes two telescoping members, viz., a cam-operated member *1* and a bottle-supporting member *2*. The member *1* has a socket at its top in which the contracted circular stem of the member *2* may slide, the parts being thus capacitated to telescope and shorten and thereby preventing excessive pressure on the bottles in the same way in which the parts of the patented construction telescope. The reduced part of the member *2* has beveled shoulders *5*, which are engaged by anti-friction rolls on tripping dogs *3*. These tripping dogs holds the parts *1*, *2*, from telescoping until the required pressure has been exerted by the capping die upon the bottle. In order that the antifriction rolls on the dogs may engage the shoulders sufficiently strongly to prevent the telescoping operation, the dogs are forced inward by

springs 4, which are under original predetermined compression, these springs being mounted on rods 6, supported in ears 7 on the dogs. The springs under original predetermined compression bear, therefore, against the ears 7 on the dogs, their compression being determined and held by nuts 8, 9, on the ends' of the rods. When a bottle is placed on the top of the part 2, the support is pushed upward by the cam which operates on the bottom of the member 1, this movement operating to push the bottle with the cap thereon into the die. (From description in complainant's brief.)

The stem B has two square side recesses C, the bottoms of these recesses forming shoulders D. These recesses are engaged by blocks E of generally rectangular outline pivoted on pivots F secured in the socketed head G into which the plunger extends. Plates H which are pivoted to the head extend down behind the blocks E and these plates are backed up by springs I. When the plunger A meets an obstruction such as a stone in the mold, and, therefore,

develops a destructive pressure which would, if not relieved, break the machine, the shoulders D are forced so strongly against the blocks E as to cause them to rock on their pivots F and release the plunger, thus allowing it to telescope into the socket G.

COMPLAINANT'S SELECTOR AND FEEDER.

The accompanying cut is a reproduction of Figs. 1 and 5 of the patent. The crowns are placed in a large storage hopper e of the accompanying cut of complainant's hopper. The bottom of this hopper is formed by an inclined plate $e^3$ down which the crowns are fed through an opening $e^2$ into a chamber E. This chamber E is referred to in the patent as an "external chamber"; that is, it is external to the hopper. It is, however, intermediate the hopper and the tumbling drum or cage k. This drum or cage is mounted to rotate on a shaft f and has its outer side closed and provided with sight openings $k^1$. It also has a central opening $k^2$ through which the crowns are transferred from the chamber E to the tumbling chamber or cage by means of rotating lifters $k^6$. This cage k is generally frustoconical in shape and has a flat annular portion at its base which faces a ring $k^2$. This ring has secured to it, by pins $k^4$, a series of blocks $k^3$ which extend toward the annular portion of the cage.

The openings formed by these blocks are of such shape that the crowns can pass through only when their cork disks face the annular portion of the tumbling cage. Such crowns as pass between the blocks fall into a channel $h^3$ surrounding the cage and run down a chute $h^5$ which delivers them to the capping head $b^2$, this being the head which contains the steel capping die before referred to. With this construction, a large supply of crowns in an indiscriminate mass can be thrown into the hopper, $e$, a certain number of these crowns, of course, descending at once into the external or intermediate chamber $E$. Only a limited number of these crowns, however, can pass from the external or intermediate chamber $E$ through the central opening $e^2$ into the tumbling drum or cage, the quantity being determined by the form and size of the opening $e^2$.

DEFENDANT'S SELECTOR AND FEEDER.

Referring to this drawing, $1$ indicates the hopper into which the large mass of crowns is indiscriminately dumped. This hopper has an inclined bottom formed by a plate $2$. A second plate $6$ is located below the plate $2$, and has

its end bent downward so as to form a sort of throat. The plates *2* and *6* form the top wall of a regulating chamber, which is marked *3*, this chamber being inclosed by a wall formed in one piece with the hopper casting *1*. The regulating chamber communicates through an opening *14* with a tumbling receptacle or cage formed by a bell-shaped ring *8* and a front plate *7*. This cage is mounted on a rotating shaft, as clearly shown in the drawings, but not lettered. Pins *9* are located in the space between the flat annular portion of the cage *8* and the outer edge of the plate *7*, these pins being so arranged that the crowns can only pass through them when in the proper position. Such crowns as pass through fall into a surrounding channel *10* and are fed from it down a chute *15* to the capping head. To prevent the crowns from choking in the somewhat narrow opening beyond the edge of the plate *2* and formed by it and the plate *6*, the plates are pivoted and are agitated by a tappet *5* mounted on a rotating shaft *4*. As the shaft rotates, this tappet moves the plates up and down and tends to facilitate the feeding of the crowns through the narrow opening. The crowns are delivered from the regulating chamber *3* to the tumbling cage through an opening *14*, the quantity of crowns thus delivered being determined, of course, by the size and form of the opening as in the patented construction. (Language that of complainant's brief.)